MIED ProSe 1 (Rev 5/16)  Complaint for a Civil Case

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

Jason D. Fisher

*(Write the full name of each plaintiff who is filing this complaint. If the names of all the plaintiffs cannot fit in the space above, please write "see attached" in the space and attach an additional page with the full list of names.)*

**v.**

FAITH Miller Scheinkman, MILLER ZEIDERMAN & WIEDERKEHR LLP,
JOANNE CAMBARERI, JENNIFER LIGHTER,
GARY LIGHTER,
JESSICA LIGHTER, TIFFANY GALLO, JENNIFER JACKMAN,
GUTTRIDGE & CAMBARERI, PC

*(Write the full name of each defendant who is being sued.  If the names of all the defendants cannot fit in the space above, please write "see attached" in the space and attach an additional page with the full list of names.)*

Case No.

_____
*(to be filled in by the Clerk's Office)*

Jury Trial:    ☒ Yes    ☐ No
*(check one)*

# Complaint for a Civil Case

MIED ProSe 1 (Rev 5/16)  Complaint for a Civil Case

## I.  The Parties to This Complaint

### A.  The Plaintiff(s)

Provide the information below for each plaintiff named in the complaint.  Attach additional pages if needed.

| | |
|---|---|
| Name | Jason D. Fisher |
| Street Address | |
| City and County | |
| State and Zip Code | |
| Telephone Number | |
| E-mail Address | jasondfisher@protonmail.com |

### B.  The Defendant(s)

Provide the information below for each defendant named in the complaint, whether the defendant is an individual, a government agency, an organization, or a corporation. For an individual defendant, include the person's job or title (if known).  Attach additional pages if needed.

| Defendant No. 1 | |
|---|---|
| Name | Faith Miller (Scheinkman), Miller Zeiderman & Wiederkehr Llp, Tiffany Gallo, Jennifer Jackman, |
| Job or Title (if known) | lawyers and law firm |
| Street Address | 140 Grand St, |
| City and County | White Plains, |
| State and Zip Code | NY 10601 |
| Telephone Number | 914.455.1000 | |
| E-mail Address (if known) | fgm@mzw-law.com |

| Defendant No. 2 | |
|---|---|
| Name | Gary Lighter, Jessica Lighter, |
| Job or Title (if known) | |
| Street Address | 3 South Lake Drive |
| City and County | Stamford |
| State and Zip Code | CT 06903 |
| Telephone Number | 2034619555  9148435300 |
| E-mail Address (if known) | garylighter@gmail.com |

Defendant No. 3

| | |
|---|---|
| Name | jennifer lighter |
| Job or Title (if known) | physician |
| Street Address | 130 wendover road |
| City and County | rye, westchester |
| State and Zip Code | NY 10580 |
| Telephone Number | 6465817029 |
| E-mail Address (if known) | jen_lighter@yahoo.com |

Defendant No. 4

| | |
|---|---|
| Name | Joanne Cambareri,  Guttridge & Cambareri, Pc, |
| Job or Title (if known) | lawyer and law firm |
| Street Address | 222 Bloomingdale Road Suite 301 |
| City and County | White Plains |
| State and Zip Code | NY 10605 |
| Telephone Number | 914-631-6900 |
| E-mail Address (if known) | jguttridge@gclawny.com |

## II.    Basis for Jurisdiction

Federal courts are courts of limited jurisdiction (limited power).  Generally, only two types of cases can be heard in federal court: cases involving a federal question and cases involving diversity of citizenship of the parties.  Under 28 U.S.C. § 1331, a case arising under the United States Constitution or federal laws or treaties is a federal question case.  Under 28 U.S.C. § 1332, a case in which a citizen of one State sues a citizen of another State or nation and the amount at stake is more than $75,000 is a diversity of citizenship case.  In a diversity of citizenship case, no defendant may be a citizen of the same State as any plaintiff.

What is the basis for federal court jurisdiction?  *(check all that apply)*

☒  Federal question        ☐  Diversity of citizenship

Fill out the paragraphs in this section that apply to this case.

**A.    If the Basis for Jurisdiction Is a Federal Question**

List the specific federal statutes, federal treaties, and/or provisions of the United States Constitution that are at issue in this case.

18 U.S.C. Section 1962(C) Predicate Acts:  Use Of Fraud Within Bank, Mail And Wires To Defraud Plaintiff In 18 U.S.C. Sections 1341, 1343. And 1344, 18 U.S.C. Section 1542 (False Statement In Application And Use Of Passport) , 18 U.S.C. Section 1957, 18 U.S.C. Section 1503 ( Obstruction Of Justice), 18 U.S.C. Section 1951 ( Interference With Commerce, Robbery, Or Extortion), Violation Of 18 U.S.C. Section 1510 (Obstruction Of Criminal Investigations), 18 U.S.C. Section 1511 (The Obstruction Of State Or Local Law Enforcement), 18 U.S.C. Sections 471, 472, And 473 (Relating To Counterfeiting),  U.S.C. Section 1512 (Relating To Tampering With A Witness, Victim, Or An Informant), Section 1513 ( Retaliating Against A Witness, Victim, Or An Informant), 18 U.S.C. Sections 1831 And 1832 ( Economic Espionage And Theft Of Trade Secrets),  18 U.S.C. Sections 1833-1839 The Economic Espionage Act Of 1996 (18 U.S.C. Sections 1831-1839), The Defend Trade Secrets Act Of 2016  (18 U.S.C. § 1836) ,
Rico § 18 U.S.C. § 1962 (D), 18 U.S.C. § 1961,        U.S. Constitutional Amendments: Fourteenth, Eighth, First

**B.    If the Basis for Jurisdiction Is Diversity of Citizenship**

1.    The Plaintiff(s)

a.    If the plaintiff is an individual
The plaintiff, *(name)*_____,
is a citizen of the State of *(name)*_____.

b.    If the plaintiff is a corporation
The plaintiff, *(name)*_____,
is incorporated under the laws of the State of *(name)*
_____, and has its principal place of business in the
State of *(name)*_____.

*(If more than one plaintiff is named in the complaint, attach an additional page providing the same information for each additional plaintiff.)*

2.    The Defendant(s)

a.    If the defendant is an individual
The defendant, *(name)*_____, is a citizen of the
State of *(name)*_____.  *Or* is a citizen of *(foreign
nation)*_____.

b.    If the defendant is a corporation
The defendant, *(name)*_____, is incorporated
under the laws of the State of *(name)*_____, and
has its principal place of business in the State of *(name)*
_____.  *Or* is incorporated under the laws of
*(foreign nation)*_____, and has its principal place
of business in *(name)*_____.

*(If more than one defendant is named in the complaint, attach an additional page providing the same information for each additional defendant.)*

4

3.     The Amount in Controversy

The amount in controversy—the amount the plaintiff claims the defendant owes or the amount at stake—is more than $75,000, not counting interest and costs of court, because *(explain)*:

## III.   **Statement of Claim**

Write a short and plain statement of the claim.  Do not make legal arguments.  State as briefly as possible the facts showing that each plaintiff is entitled to the damages or other relief sought. State how each defendant was involved and what each defendant did that caused the plaintiff harm or violated the plaintiff's rights, including the dates and places of that involvement or conduct.  If more than one claim is asserted, number each claim and write a short and plain statement of each claim in a separate paragraph.  Attach additional pages if needed.

Please see attached claim

**IV.    Relief**

State briefly and precisely what damages or other relief the plaintiff asks the court to order.  Do not make legal arguments.  Include any basis for claiming that the wrongs alleged are continuing at the present time.  Include the amounts of any actual damages claimed for the acts alleged and the basis for these amounts.  Include any punitive or exemplary damages claimed, the amounts, and the reasons you claim you are entitled to actual or punitive money damages.

Please see damages section of attached claim

**V.    Certification and Closing**

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

**A.    For Parties Without an Attorney**

I agree to provide the Clerk's Office with any changes to my address where case-related papers may be served.  I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing: _____, 20_____.

Signature of Plaintiff    _____

Printed Name of Plaintiff    _____

**Additional Information:**

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

## DEFENDANTS

**(b)** County of Residence of First Listed Plaintiff
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
pro se

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1   U.S. Government Plaintiff
- ☒ 3   Federal Question *(U.S. Government Not a Party)*
- ☐ 2   U.S. Government Defendant
- ☐ 4   Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*    *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | | ☒ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | | ☐ 835 Patent - Abbreviated New Drug Application | ☒ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | **LABOR** | ☐ 840 Trademark | ☐ 480 Consumer Credit (15 USC 1681 or 1692) |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☒ 710 Fair Labor Standards Act | ☐ 880 Defend Trade Secrets Act of 2016 | ☐ 485 Telephone Consumer Protection Act |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 720 Labor/Management Relations | | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 740 Railway Labor Act | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 196 Franchise | | | ☐ 751 Family and Medical Leave Act | ☐ 861 HIA (1395ff) | ☐ 890 Other Statutory Actions |
| | | | ☐ 790 Other Labor Litigation | ☐ 862 Black Lung (923) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 791 Employee Retirement Income Security Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☒ 440 Other Civil Rights | **Habeas Corpus:** | | ☐ 864 SSID Title XVI | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 865 RSI (405(g)) | ☐ 896 Arbitration |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | **FEDERAL TAX SUITS** | |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 950 Constitutionality of State Statutes |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | ☐ 871 IRS—Third Party 26 USC 7609 | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation - Transfer
- ☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:

Brief description of cause: Rico Predicate acts 1962 c and 1962 d
Violation of U.S. Constitution 1, 8 14

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $ _____

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*    JUDGE _____   DOCKET NUMBER _____

DATE _____    SIGNATURE OF ATTORNEY OF RECORD   *Jason Fisher*

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

PURSUANT TO LOCAL RULE 83.11

1.          Is this a case that has been previously dismissed?                    ☐ Yes
                                                                                                        ☒ No

   If yes, give the following information:

   Court: _____

   Case No.: _____

   Judge: _____


2.          Other than stated above, are there any pending or previously
            discontinued or dismissed companion cases in this or any other          ☐ Yes
            court, including state court? (Companion cases are matters in which      ☒ No
            it appears substantially similar evidence will be offered or the same
            or related parties are present and the cases arise out of the same
            transaction or occurrence.)

   If yes, give the following information:

   Court: _____

   Case No.: _____

   Judge: _____


   Notes : _____

1  UNITED STATES DISTRICT COURT

2  EASTERN DISTRICT OF MICHIGAN

3  ------------------------------------------------------------------   Case No.

4  JASON D. FISHER  *pro se*

5  Court

6                                              Plaintiffs,              **COMPLAINT**

7                          - against –                                 **JURY TRIAL DEMANDED**

8

9  FAITH Miller Scheinkman, MILLER ZEIDERMAN & WIEDERKEHR LLP, JOANNE CAMBARERI,
10 JENNIFER LIGHTER, GARY LIGHTER, JESSICA LIGHTER, TIFFANY GALLO, JENNIFER JACKMAN,
11 GUTTRIDGE & CAMBARERI, PC

12                                              Defendants

13 ------------------------------------------------------------------x

14

15                                    **<u>COMPLAINT</u>**

16 Plaintiff JASON D. FISHER , for their Complaint against defendants FAITH Miller
17 Scheinkman, JENNIFER JACKMAN, TIFFANY GALLO, MILLER ZEIDERMAN & WIEDERKEHR
18 LLP, JOANNE CAMBARERI, GUTTRIDGE & CAMBARERI, PC, JENNIFER LIGHTER, JESSICA
19 LIGHTER AND GARY LIGHTER allege as follows:
20

21                              **<u>JURISDICTION AND VENUE</u>**

22 1.  This Court has subject matter jurisdiction over this action pursuant to 18 U.S.C. §
23 1964 [jurisdiction may also be conferred based on diversity or supplemental
24 jurisdiction].

25

26 2.  § 1965(b) of RICO provides that process may be served in "any judicial district of the
27 United States" when required by the "ends of justice." Courts have held that such
28 "nationwide service of process" provisions also confer personal jurisdiction over a
29 defendant in any judicial district as long as the defendant has minimum contacts with
30 the United States.   For reasons set forth in this complaint the Plaintiff has been
31 required to change his residence to the district of the EASTERN DISTRICT OF MICHIGAN.
32 Thus the venue can be laid in a any district in the country and the jurisdiction and
33 venue are proper in the EASTERN DISTRICT OF MICHIGAN district.

3.  Due to the complaints contained herein, a venue outside of New York State is requested.  Many of the complaints are a direct result of the Enterprise  which is part of the New York Judicial System as well as practices and procedures within New York that defy Constitutional Law.  It should be noted that appeals and complaints to regulatory, judicial, and investigative agencies in the State of New York have already been performed repeatedly in writing by the Plaintiff.  The Plaintiff attempted to file complaints, report crime, and submit evidence but the State has not responded nor taken action.  It should also be noted that the Defendants and Enterprise itself have made attempts to undermine the integrity of the Plaintiff's claims via obstruction and falsification to weaken his ability to file an action.  Second, the triangular relationship of lawyer Faith Miller Scheinkman as spouse to Judge Scheinkman and the NY Court (Enterprise) is well known in New York State and has occurred without any material actions by the state to prevent conflicts of interest.   Thus, the stature of Judge Scheinkman within the State of NY has allowed this relationship within the Enterprise to remain unquestioned despite the financial interest that Judge Scheinkman has in Miller Scheinkman's firm. Simply put, Faith Miller Scheinkman practiced law within her husbands district and has undue influence over the Enterprise.  Likewise, the husband and wife both benefit from her firm's financial income derived from judgments and performance within the Enterprise. Third, the Plaintiff identified and presented crimes of Faith Miller Scheinkman and related parties to the Enterprise that negatively affected his action and rights.  The Enterprise, instead of investigating and preventing, acted as a protectorate of the Defendants and further allowed for further unwarranted crimes against the Plaintiff to occur as demonstrated herein.  As such, the claims herein pose a significant liability to the State of New York and/or its agencies; any remediation should be determined by a neutral party outside of the State of New York venues and all related matters should be resolved outside of the State of New York.

## PARTIES

4.  Plaintiff, Jason Fisher, is an individual. Plaintiff is the founder and CEO of Mico Bio Incorporated which is also a C corporation as represented by its founder and investors with its principal place of business in New York, New York and Rye New York.  The Plaintiff has been working on additional patents exclusively for the firm to refine the technology based on laboratory research as well as scientific insights.  Thus, going forward, this property of the C Corporation which includes scientific notes, data, notes and pending patents will be referred to as "intellectual property".

The Plaintiff founded Mico Bio Inc. and assigned the patent and related work to the company.  Mico Bio Incorporated is a biotechnology company that specializes in the development of aerosolized vaccines.  The Plaintiff is an inventor and patent author,

1   and is experienced in pharmaceuticals and biotechnology.  All research and pending
2   intellectual property related to this area of biotechnology is owned by the firm and its
3   investors.  The Plaintiff has worked with the National Institute of Health, as well as
4   developed research partnerships with universities to conduct the firm's research.  The
5   firm has raised capital from multiple international investors.
6   The Plaintiff authored and developed a vaccine patent allowed in 36 countries and was
7   in the process of working on additional patents and raising money. During this time, he
8   primarily worked from home in the years prior to filing the divorce in order to spend
9   time with his children.
10  Plaintiff is a father of two boys.  The Plaintiff filed a legal action for divorce against the
11  Defendant Jennifer Lighter after realizing the Defendant was responsible for crimes
12  mentioned in this complaint and after he received a series of threats.  Until he filed the
13  action in 2018, he spent more time with the children than any other adult and did
14  numerous activities with the children.  He put them on the school bus each and every
15  day, did homework with them, helped coach, taught them musical instruments, taught
16  them chess, did crafts, helped them with online learning programs, and swam with
17  them.
18
19  **<u>Interstate or Foreign Commerce</u>**.  The activities of the Plaintiff and/or the
20  biotechnology company involved parties in California, New York, Massachusetts,
21  Washington, Maryland, Colorado, United Kingdom, Bahamas, Germany, and Louisiana.
22  The patents of the firm were allowed in 36 countries and were a product of many years
23  of drafting and patent responses by the Plaintiff.  Likewise, the investor base reflects
24  locations such as California, New York, United Kingdom, Washington, Connecticut, and
25  Bermuda.  The Plaintiff has likewise developed patent applications and further
26  intellectual property for application in the U.S. E.U., Japan, Mexico, Canada, and other
27  territories that were intended to contribute to help attract capital raising. All of this
28  patent activity is on hold.  Moreover allowed patents and patent applications have been
29  irreversibly damaged due to theft by the Defendants. The Plaintiff intended to develop
30  the future technology and its intellectual property for multinational markets.  Key parts
31  of this intellectual property are still being withheld by the Defendants and the
32  Defendant has engaged a patent attorney.  All patents and related technology were
33  assigned to the firm Mico Bio Inc.
34
35  5.  Defendant, Miller Zeiderman & Wiederkehr LLP is a LLP corporation with its principal
36  place of business at 150 East 52nd Street Suite 1903, New York, NY 10022.  The law firm
37  specializes in family law in New York.
38
39  6.  Defendant Faith Miller Scheinkman (Defendant Miller Scheinkman) is the wife of Alan

1  Scheinkman, the Presiding Justice of the Appellate Division, Second Judicial
2  Department, State of New York.  Defendant F. Miller Scheinkman is a partner at Miller
3  Zeiderman & Wiederkehr LLP.
4
5  7.  Defendant Jennifer Jackman is a partner at Miller Zeiderman & Wiederkehr LLP.
6
7  8.  Defendant Tiffany Gallo is a partner at Miller Zeiderman & Wiederkehr LLP.
8
9  9.  Defendant Joanne Cambareri is a partner at Guttridge & Cambareri, PC
10
11  10.  Guttridge & Cambareri, PC is a Professional Corporation with its principal place of
12  business at 222 Bloomingdale Road, Suite 301, White Plains, NY 10605.
13
14  11.  Defendant Jennifer Lighter, is an Individual with her principal address at 130
15  Wendover Road, Rye NY 10580.
16
17  12.  Defendants Gary Lighter and Jessica Lighter , are Individuals with their principal
18  address at 3 South Lake Drive, Stamford, CT 06903.  Gary Lighter and Jessica Lighter are
19  the parents of Jennifer Lighter.  Jessica Lighter is a psychologist in the same area and
20  has relationships with other psychologists that the children see.
21
22                              **ENTERPRISE**
23  13.  Former Judge Alan Scheinkman (Enterprise I) is the husband of Defendant Faith
24  Miller Scheinkman.  Judge Alan Scheinkman was the Presiding Justice of the Appellate
25  Division, Second Judicial Department, State of New York for the events described in this
26  complaint.  Alan Scheinkman is married to Defendant Faith Miller Scheinkman and via
27  marriage is an equity holder in Faith Miller Scheinkman's Firm.   Therefore, any
28  decisions that are made against Faith Miller Scheinkman's law firm negatively affect the
29  Enterprise's boss directly, including those decisions of Judge Lubell who has handled
30  the majority of the Plaintiff's case and complaints against Faith Miller Scheinkman's
31  firm. The marital relationship and hierarchy creates an inherent conflict of interest for
32  the Presiding Judge of the Enterprise over any case whereby there may be a liability or
33  income to Faith Miller Scheinkman's Firm.  In the Plaintiff's case the conduct of Faith
34  Miller Scheinkman's firm is being questioned civilly, ethically, financially and criminally.
35  The conduct of attorneys, including those attorneys of his wife and wife's colleagues, is
36  governed by the New York State Appellate Division.  Judge Scheinkman was previously
37  the District Administrative Judge for the 9th Judicial District of the New York Supreme
38  Court Division.  Alan Scheinkman retired at the end of 2020 from the Second Judicial

Department well after the Plaintiff suffered from the civil rights and conspiracy violations due in part to his presence.   Being that former Judge Scheinkman has left the government recently and crimes against the Plaintiff have continued he may also be named  as a Defendant.  As a husband to the Defendant Faith Miller Scheinkman, Judge Scheinkman is an equity holder and beneficiary of income of Miller Zeiderman & Wiederkehr LLP.

14.  Judge Lewis Lubell, (Enterprise I) Justice Supreme Court, Westchester County elected from 2006 to Present.   Judge Lubell, Supervising Judge for Matrimonial Matters, is a subordinate to Judge Scheinkman.   No Justice or Judge would allow  convenient consistent disregard for the law as well as unilateral enforcement of the law as has been demonstrated by Judge Lewis Lubell.  Judge Lubell is a significant agent or tool of the Enterprise.  Judge Lubell's decisions in the Plaintiff's matter has had the ability to expose his boss and boss's wife to risk or alternatively generate income for Faith Miller Scheinkman's firm and for Judge Scheinkman.  Judge Lubell has full knowledge of Judge Scheinkman and Faith Miller's marriage.

15.  Referee Irene Ratner (Enterprise I).  Referee Ratner is a subordinate to Judges Scheinkman and Lubell. Referee Ratner is instrumental in acting as a ringleader in off-record meetings whereby acts against the Plaintiff were endorsed and executed.

16.  (Enterprise I) Members; Judge Colangelo, Judge Greenwald, & Judge Koba, are subordinates to Judge Scheinkman and Judge Lubell.  Judge Koba's decisions and judgments can only ever be a product of years of civil rights violations and criminal violations that have been willfully allowed by the Enterprise prior to her involvement.

17.  Supreme Court State of New York (Enterprise I), Westchester County as associated with the Plaintiff's index number of No. 58301/2018

18.  Westchester County Clerk (Enterprise I)

19.  Administrative Judge Larry Marks, Chief Administrative Judge of the Courts (Enterprise I)

20. Court Reporters of Supreme Court State of New York (Enterprise I), Westchester County

21.  Mr. Rosetti Bronx County Clerk Attorney (Enterprise II)

22.  Supreme Court State of New York, Bronx County (Enterprise II)

1  Bronx County Clerk (Enterprise II) as associated with the Plaintiff's index number of
2  7933/2019
3
4  23.  The NYS Grievance Committee remained under the hierarchy of Judge Scheinkman

5  24.  The relationship between Defendant Cambareri, Defendant Jackman, Defendant
6  Miller Scheinkman, Defendant Guttridge constitutes an association in fact enterprise
7  under 18 U.S.C. ß 1961 (4) and the persons controlling or directing the affairs of
8  Enterprise I have engaged in activities or a pattern or practice of conspiracy and
9  racketeering activity in violation of 18 U.S.C. ß 1962 et seq.

10  25.  Alternatively, the relationship between Enterprise I, Judge Scheinkman and
11  Defendant Miller Scheinkman constitutes an association in fact enterprise under 18
12  U.S.C. ß 1961 (4) and the persons controlling or directing the affairs of Enterprise I have
13  engaged in activities or a pattern or practice of conspiracy and racketeering activity in
14  violation of 18 U.S.C. ß 1962 et seq.

15  26.  Alternatively, the relationship within and between the Supreme Court of
16  Westchester County and Westchester County Clerk (hereafter the Enterprise I)
17  constitutes an association in fact enterprise under 18 U.S.C. ß 1961(4) and the persons
18  controlling or directing the affairs of Enterprise I have engaged in activities or pattern
19  or practice of conspiracy and racketeering activity in violation of 18 U.S.C. ß 1962 et seq.

20  27.  Alternatively, the relationship between the Supreme Court, Bronx County (hereafter
21  the Enterprise II) and Supreme Court, Court, Westchester County constitutes an
22  association in fact enterprise under 18 U.S.C. ß 1961(4) and the persons controlling or
23  directing the affairs of Enterprise II have engaged in activities or pattern or practice of
24  conspiracy and racketeering activity in violation of 18 U.S.C. ß 1962 et seq.  The Action
25  of Plaintiff was declined due to false information as specified in Judge Latia W. Martin's
26  statement "The Court hereby declines to sign the OSC. Motion is filed in the improper
27  venue of Bronx County".  CPLR provides that a motion to change venue can be filed in a
28  county to which the change is sought.

29  28. Shannon Roach is an Individual and member of the Enterprise, and was at first a full
30  time caretaker and then a part time caretaker during the years just prior to the
31  Plaintiff's action in 2018.  Mrs. Roach receives income and higher education under the
32  direction of the Lighter family.  Mrs. Roach has acted to prevent the children from
33  seeing their dad and violated Court Orders under the direction of the Defendant
34  Jennifer Lighter.
35

29.  Other potential parties of interest and/or members include:  Jeff Kaplan and associates, Mitch Lieberman, Don and Dena Moss.  Other potential parties lawyers consulted by the Defendants concerning intellectual property rights and other issues.

The Defendants maintained and exercised control over the enterprises alleged.

## ACTIVITY

30.  Since approximately 2016 through to the present, persons controlling or directing the affairs of Enterprises I and II engaged in and joined in a conspiracy to intentionally, recklessly and/or negligently conceal criminal conduct of its agents, aid and abet the concealment of criminal conduct, aid and abet civil misconduct, fail to report criminal conduct of its agents, obstruct justice, obstruct investigation, obstruct state and/or local laws, evade criminal and/or civil prosecution and liability, coerce and/or extort the Plaintiff in order to keep its civil and criminal misconduct secret, violate the civil rights of children and the Plaintiff, engage in mail fraud, engage illegally in eavesdropping to advance the conspiracy, manipulate the Enterprise to deprive the rights of the Plaintiff to file grievances with the Government, retaliate against witnesses and informants and engage in theft and dissemination of corporate secrets of a biotechnology C corporation.

31.  The persons controlling or directing the affairs of Enterprises I and II knew the Defendants were breaking a multitude of laws and they showed willful indifference and/or reckless or intentional disregard for the Plaintiff, the C Corporation, and the Plaintiff's children in order to further their scheme.

32.  The Defendants Miller Scheinkman, J. Jackman, J. Cambareri, and other lawyers have motives to be involved in a conspiracy and exercise control over the Enterprise. In both cases, the activities alleged have the motive of directly benefiting the income of the Enterprise I members. First, the ability of the Defendants to either successfully "win" Westchester cases with Court decisions contributes to a reputation of the Defendants as invincible. This reputation serves to advance the reputation of Miller Scheinkman and provides the ability for Defendant Miller Scheinkman and those members to garner future business and gain high profile, higher paying clients such as R. Giuliani.  Second, the ability of the Defendants to "drag out" cases via influence over the Enterprise provides a significant ongoing income stream for the Defendants irrespective of any consideration for the outcome.  **Third, the Enterprise creates the ability to receive judgements that directly benefit the income of Judge Scheinkman and spouse Faith Miller Scheinkman's law firm.**  In all cases, these

motives directly benefit the income of the Enterprise I member Judge Scheinkman. Additionally, these Defendants also intend to protect themselves from the crimes they have committed during the Plaintiff's case by furthering the conspiracy and thereby unduly influencing the Enterprise.

33. Likewise, the Defendants Gary Lighter and Jessica Lighter have motives and capability to be involved in a conspiracy with the aforementioned Defendants.  These Defendants are motivated financially with regard to the intellectual property assets of the Corporation, the assets of the Plaintiff and to culturally monopolize the grandchildren.   These Defendants are motivated to further protect themselves from prosecution for the crimes they have admitted to.  Thus, the Defendants have sought to extort and coerce Plaintiff to relinquish intellectual property and other assets of the Plaintiff.  The Defendants extorted and coerced the Plaintiff through extensive financial and personal means.  These means include but are not limited to theft of corporate documents, illegal electronic surveillance, illegal dissemination of Corporate Documents, demanding that corporate intellectual property be reassigned to the Defendants, intercepting the Plaintiff's mail, threatening the Plaintiff and his family, depriving access to his children, depriving access to his home.  These defendants are motivated personally to culturally monopolize the children.  The Defendant Gary Lighter has made verbal threats towards the Plaintiff which have been witnessed.  Faith Miller Scheinkman has on many occasions incorrectly called the Defendant Jen Lighter by her mother's name Jessica Lighter.  Defendant Jessica Lighter whose family has ties to organized crime appears to be employing Faith Miller Scheinkman's firm.

34. Members of the Enterprise are motivated by the power, income, prestige and prominence of their leader, Judge Alan Scheinkman.  Judge Scheinkman has appointed either directly or indirectly many of the Court personnel.  The Court personnel material in this matter include but are not limited to Judge Lubell, Judge Colangelo, Judge Koba, Court Reporters and Referee Ratner.  These individuals all remain motivated by endorsements for positions of elected officials as well as the ability to receive future appointments.  Moreover, Judge Scheinkman has the motive and capability to retaliate against individuals who make efforts against Judge Scheinkman's wife and the ability to reward individuals who protect or endorse his wife's agenda.

35. Beginning in 2018 and during numerous occasions, Enterprise I was notified both in writing and in person of the theft of corporate documents, theft of the founder's intellectual property, violations of law by the Defendants, perjury of the Defendants, as well as other ongoing crimes of the Defendants.  The communications outlined the

nature of the crimes and the actions that must be taken to protect the Plaintiff and the intellectual property of the C Corporation as well as the investors of the C Corporation. In response, the Enterprise I ignored the notifications and instead continued to provide a fertile environment to continue and escalate further crimes against the Plaintiff. Upon information and belief, Enterprise I allowed for the racketeering activity described above in order to protect the financial interests of the Defendants as well as to protect the Defendants from criminal prosecution and other aspects of the scheme described above.

36.  Communicated within the same written notification above, the Plaintiff cautioned the Enterprise and requested protection from the Defendants to further protect the assets of the Plaintiff and the C Corporation.  The Plaintiff warned the Enterprise that the Defendant's actions would cause the Plaintiff and the assets of the Corporation further harm and destroy the ability of the Plaintiff to receive income and work for the Corporation as a going concern.  These warnings were not heeded and the Enterprise has protected the Defendants from prosecution or investigation of crimes.  The Plaintiff is a founder and CEO of a biotechnology company that has an allowed patent in 36 countries, conducts interstate research, and has an international investor base.

37.  **In another aspect, the persons controlling or directing the affairs of the Enterprise are responsible for attempting to violate the Plaintiff's bank accounts, email accounts and other financial accounts.**

38.  **In another aspect the persons controlling or directing the affairs of the Enterprise are directly responsible for impeding and preventing the Plaintiff from paying taxes and other debts.**

39**.  In another aspect, the persons controlling or directing the affairs of the Enterprise are responsible for falsifying medical information related to the Plaintiff.**  It is believed that the motive was to undermine the credibility of the Plaintiff.

40.  **In furtherance of its scheme, persons controlling or directing the affairs of the Enterprise I and/or II utilize their power through marriage as a means of linking the Defendants and Enterprise.**  Defendant Faith Miller Scheinkman leverages her marriage to Judge Scheinkman to influence and control the members of the enterprise who are Judge Scheinkman's subordinates within the Westchester Court System.  Faith Miller Scheinkman's role in the enterprise, given her husband's stature, enabled the defendants to commit, or facilitate the commission of, the racketeering acts. The Defendant Miller Scheinkman performed the actions for her own profit-seeking motives, for reputation, and to protect herself from potential litigation or prosecution

for alleged crimes.  Defendant Miller Scheinkman has broken laws further detailed, knowingly provided false and hypocritical statements, and directed her client to violate New York State and Federal Laws.  Despite her actions which have been presented with evidence to the Court, not one Judge will take any investigative or disciplinary action. These Judges are subordinates of Faith Miller Scheinkman's husband.  The evidence shows beyond doubt that the power and prestige of the office of Faith Miller Scheinkman's husband placed her in a position to perform the discrete, corrupt and fraudulent acts.

The Defendant used and manipulated the resources, property, or facilities of the enterprise to commit the predicate acts and as such the Defendant committed these acts "through" the enterprise.

> A. Faith Miller Scheinkman caused the Enterprise to delay legal proceedings  at the benefits of the Defendant.
>
> B.  Faith Miller Scheinkman caused the Enterprise to issue penalties to the Plaintiff
>
> C. Faith Miller Scheinkman caused the Enterprise to manipulate Court Scheduling to the Defendant's advantage and to create further threats to the Plaintiff.
>
> D. Faith Miller Scheinkman caused the Enterprise to reject motions.  Those rejections were based on false statements
>
> E.  Faith Miller Scheinkman caused the Enterprise to make negative decisions against the Plaintiff
>
> F.  Faith Miller Scheinkman caused the Enterprise to deny the Plaintiff his Constitutional rights.
>
> G. Faith Miller Scheinkman caused the enterprise to allow for complete disregard of CPLR procedures to the benefit of her firm and the detriment of the Plaintiff

The nexus exists between the racketeering acts and the enterprise since the defendant was able to commit the predicate acts by means of, by consequences of, by reason of, by the agency of, and by the instrumentality of her husband's association with the enterprise.

## **1962c VIOLATIONS**

41.  **In furtherance of its scheme, persons controlling or directing the affairs of the Enterprises I and/or II engaged in violations associated with 1962 c.**  The Defendants conducted and participated in the affairs of the Enterprises through a pattern of extortion, theft, coercion, conspiracy, obstruction via perjury, counterfeiting, and retaliation against witnesses and informants.

42. **In furtherance of its scheme and enterprise to protect the lying and thieving Defendants from criminal prosecution and civil liability, maintain and increase ongoing income, increase their ability to control assets of the Plaintiff and C corporation, and to avoid public scandal within the Court, persons controlling or directing the affairs of the Enterprises I and/or II, intentionally and fraudulently engaged in routine practices of denying due process and obscuring the Plaintiff's written attempts to gain justice.** The Enterprise I ensured that the Plaintiff's files as required by the Westchester Court System were only accessible to the Westchester Court and not to external Court System personnel.  The existence of multiple files and letters from the Plaintiff and his lawyers were not disclosed to or made available to the Administrative Judge, or others in order for the Administrative Judge to investigate the known crimes of the Enterprise.  In fact, it is within reason that this practice of obscuring and hiding these communications which are mandated by the Enterprise are being used to  benefit, under false pretenses, the Defendants Miller Scheinkman, the law firm, the Defendant Jackman as well as the Enterprise.  The ability of the Enterprise to hide the communications provides for a direct means for the Enterprise Supreme Court, Westchester County to look more efficient than other competing Courts. Apparently, the jurisdiction does appear more efficient which would naturally lead to more recognition and advancement of its members of the Enterprise.  Thus, a natural motive exists by which the Defendants and the Enterprise could naturally hide communications from the Administrative Judge, from other government entities, or from other members of government.

Of importance to this complaint, the Enterprise hid the communications of adversaries of the Defendant as a means to silence the Plaintiff and possibly similar adversaries to Faith Miller.   One mechanism to silence the Plaintiff was a  **"permission based motion practice"** designed by Judge Scheinkman that was published online and was enforced at the convenience of Faith Miller Scheinkman to silence her opponent, the Plaintiff. This mechanism, referred to as "Rule E", hid and obstructed the attempts of the Plaintiff or other adversaries of the Defendants to file grievances with the government.  The Enterprise also had rejected all the Plaintiff's attempts to file a motion.  Legal silence in this matter is a rejection of all of the Plaintiff's attempts to file motions and/or other Court proceedings as well as the failure by the Enterprise to record these rejections.   It is unlikely that any other jurisdiction in the country adheres to a "permission-based" or "negative gatekeeping" motion system as designed and published by the Enterprise member Judge Scheinkman.  Thus, by using her husband's "permission based" motion system under the cooperation of the Enterprise, Faith Miller Scheinkman dominated

1  and controlled the Plaintiff's legal voice via her firm while the Enterprise continued to
2  uphold the practice at her favor to result in simply unconstitutional acts.  It is likely that
3  Faith Miller Scheinkman's firm gained advantage through these unconstitutional tactics
4  in other cases when it was convenient.  The Enterprise concealed all of the Plaintiff's
5  attempts to file a motion under this system.

6  As evidence of this fraudulent practice and its use, on September 27th 2019, a letter
7  from Judge Lawrence K. Marks, the Chief Administrative Judge stated, as a response to
8  the Plaintiff's letter, that there was no evidence that Plaintiff had attempted to file any
9  motions.  The Plaintiff's letter requested intervention due to the Plaintiff's inability to
10 gain a response from the Court to make motions (as per Westchester Court Rules as
11 defined by Judge Scheinkman) and for the Court's failure to address the theft of
12 corporate documents and its dissemination by the Defendant.   Judge Mark's letter
13 indicates that he was unable to see the approximate ten letters to the Court and that
14 these attempts were hidden from him by his conversation with Judge Lubell in
15 chambers.   In his letter, Judge Marks stated that he:

16       "reviewed the Court record in this e-filed case and discussed this matter with
17       Judge Lubell's chambers."  Judge Marks later states "Based on the file of this
18       action, I also do not any evidence that you have been denied the right to make
19       motions." And then states "court rules provide that prior to making a non-
20       emergency application, the person seeking relief must request a conference with
21       the court so the court can attempt to resolve the matter in the first instance."  "I
22       see no e-filed letter or request for a rule E conference by you or either of your
23       prior attorneys requesting a pre-motion conference and your letter to Judge
24       Marks fails to identify any such request that was denied at a pre motion
25       conference."

26 Likewise, the Plaintiff's communications were further hidden regarding the theft of
27 documents as contained in these letters to the Court.  According to Judge Marks, Judge
28 Lubell allegedly stated that the Court has availed the Plaintiff's Court documents to the
29 Plaintiff many times but Judge Marks fails to acknowledge that the first offering was
30 more than a year after the infraction thereby depriving the Plaintiff of the intellectual
31 property nor did he state what proportion of those materials would be returned.
32 Moreover, Judge Lubell still does not address the theft of, deprivation of, or the
33 wrongful and unlawful dissemination of the stolen property by the attorneys.  Even
34 withstanding the fact that the Judges in the matter knew that the property of the C

corporation and that depriving the intellectual property would cause the Plaintiff substantial hardships.

43. **In furtherance of its scheme, persons controlling or directing the affairs of the Enterprise I and or II are responsible for destruction of evidence and obstruction of justice.** The persons controlling or directing the affairs of the Enterprise did not allow access to or delayed access to Court transcripts that could be used to demonstrate self-perjury of the Defendants. The Defendants would often make false statements on the record that contradicted their own previous statements regarding facts of the proceedings. The lack of access or difficulty accessing these Court transcripts occurred well beyond the Court's own deadlines to prevent the Plaintiff from being able to use these Court session transcripts as a means of defense. The obstruction provides for a means that are beyond simple Court misconduct as the importance of the transcripts were unavailable for months as opposed to weeks which is well within reasonable time to edit a stenographer's notes for a short Court session. It is also further noted that the Enterprise itself stated that the Plaintiff would not have access to the Court transcripts and that portions of the Court session would not be found on the transcripts. The Supreme Court of the State of New York is a court of record, and for the protection of all litigants all Court proceedings resulting in decisions are to be recorded. Essentially the Enterprise has made good on its threat to deprive the Plaintiff of his constitutional rights of due process. It can be inferred that because of the pressure from the controlling parties the Court Reporters within the Enterprise did not respond despite the fact that they were financially incentivized to respond with finished Court transcripts. The fact that many Court Reporters did not respond or did so with significant delays could only be through pressure or coordination of the Enterprise.

44. **In another aspect, the persons controlling or directing the affairs of the Enterprises are responsible for obstruction by actively compromising the Plaintiff's applications and filings with the Court and thereby blocking due process.** In one scheme, the Westchester County Clerk was instructed many times and confirmed that the Plaintiff was listed as *pro se.* However, the Plaintiff is continually listed as he is being represented by Jeff Kaplan, Esq. This misrepresentation is likely deliberate as the obstruction gives the Defendants and Enterprise an excuse for not serving the papers correctly. In another instance, the Westchester County Clerk attempted to remove the tabs from the submission of the Plaintiff. According to the County Clerk, Judge Lubell had instructed that tabs should be removed. However,

1   Judge Lubell had previously rejected reviewing a previous submission due to what he
2   himself identified as missing tabs (instead of page separators that were already
3   included).

4   45. **In furtherance of its scheme, persons controlling or directing the affairs of the**
5   **Enterprise successfully delayed and prevented the Plaintiff's rights of due process**
6   **to coerce the Plaintiff into the observance of unwarranted restrictions to his**
7   **home, his business, his possessions and his children.**   Referee Ratner as a
8   representative of Judge Colangelo refused to consolidate the Temporary Protection
9   Order from Family Court with the pending Supreme Court divorce action even though
10  the initiation of the Temporary Protection Order occurred well after the
11  commencement of the Plaintiff's Action and clearly had the appearance of retaliation.
12  Refusal of consolidation by Irene Ratner was in response with Faith Miller Scheinkman's
13  requests to reject any consideration of consolidation. Only until the Plaintiff filed a
14  complaint with the Judicial Complaint or Office of Court Administration (OCA) did the
15  Enterprise agree to consolidate and address the Temporary Protection Order and the
16  Plaintiff's Order to Show Cause to challenge the Temporary Protection Order. The
17  Enterprise further allowed Defendant Jennifer Lighter to file a subsequent violation
18  against the Plaintiff when the Defendant Jennifer Lighter was not present to witness
19  the allegations in addition to the fact that the first protection order never was heard.
20  This unheard violation barred the Plaintiff from seeing his children. To the benefit of
21  the Defendants, neither the Temporary Protection Order (June 2018) nor the Plaintiff's
22  Order to Show Cause (October 2018) would ever be addressed by the Enterprise as of
23  this publication.  The loss of these rights further caused the Plaintiff to lose income, to
24  become homeless, and to force the Plaintiff to become estranged from his children.
25  This coercion remains intact and yet defies the laws set forth by the Constitution of the
26  United States of America.

27  46. **In furtherance of the scheme, persons controlling or directing the affairs of**
28  **the Enterprise obstructed justice by preventing the Plaintiff from establishing his**
29  **claims to his assets or his appropriate proportion of joint assets during Financial**
30  **Discovery.**

31  47. **In furtherance of its scheme, persons controlling or directing the affairs of the**
32  **Enterprise coerced the Plaintiff into custody hearings while unilaterally allowing**
33  **the Defendant to forgo Financial Discovery.**  The coercion as it relates to the
34  Plaintiff's children will further coerce the Plaintiff to be subject to custody hearings
35  while being subject to an unresolved Temporary Protection Order.  The scheme erases

1   the fact that the Plaintiff was the primary caregiver to the children prior to the
2   Temporary Protection Order and removes all ability of the Plaintiff to gain any
3   warranted custody access to his children.  Prior to the Plaintiff filing for divorce, the
4   Plaintiff scheduled his time around to be present for the children.  The Plaintiff put the
5   kids on/off the bus each morning, had meals, did homework with them, taught them
6   musical instruments, swam, did fun projects and helped coach sports.  Such a scheme
7   was designed to remove any ability of the Plaintiff to engage meaningfully with his own
8   children and then subsequently look for a scheme to make judicial decisions while the
9   Plaintiff was under this enterprise enforced scheme.  The Enterprise had access to this
10  information regarding the Plaintiff's relationship with his own children.  The Enterprise
11  driven by the Defendants willfully deprived the Plaintiff and his children the ability to
12  continue a meaningful relationship with full knowledge of this relationship which
13  included third party reports as well as pictures, witnesses, video and audio.
14  Additionally, the Defendant and Plaintiff collectively damaged the financial well being
15  of the Plaintiff which would reduce the Plaintiff's ability to maintain a relationship with
16  his children in a custody hearing.  As such, the Plaintiff provided financial discovery
17  while the Defendant did not provide any discovery nor was instructed by the Court to
18  do so.  In fact, the Defendant was allowed by the Enterprise to forgo discovery.   To
19  further damage the Plaintiff with regard to his own children, the Enterprise under the
20  direction of the Defendants, deprived Plaintiff of the ability to gain any financial
21  security either through financial discovery, to earn income and to have any means to
22  rectify the situation.

23  48.  **In furtherance of its scheme, persons controlling or directing the affairs of**
24  **Enterprise I committed obstruction by not allowing witnesses to attend Court**
25  **Sessions to provide testimony and evidence.**  In one instance, the persons
26  controlling or directing the affairs of the Enterprise actively removed the witnesses
27  from the Court Session without allowing them to counter the perjury of Defendant J.
28  Cambareri.  Despite making it clear on the record that the witnesses were present to
29  address Defendant Cambareri's false claims to the Enterprise, the Enterprise did not
30  allow for their presentation of the facts from the witnesses, the presentation of
31  evidence contained within previous written affidavits, or the consideration of other
32  notifications from the Plaintiff to acknowledge the false statements of J. Cambareri.
33  The Enterprise dismissed the witnesses from a trial.  In this aspect, the Enterprise
34  coordinated another excuse to obstruct and prevent the perjury of Defendant J.
35  Cambareri from becoming apparent on the record.
36
37  49.  **In furtherance of its scheme, persons controlling or directing the affairs of the**

1    **Enterprises I and/or II violated the Hobbs Act in their actions against the Plaintiff.**
2    The Defendants conspired to take over property of the Plaintiff and property of the
3    biotechnology corporation.  In effect and in direct violation of the RICO's civil liability
4    provision section C, the Defendants obstructed access to, delayed and undermined the
5    development of future patents as well as the potential to raise additional capital.
6    Accordingly, the Defendant Faith Miller Scheinkman stated on the record that the
7    patents should be given to the Defendant.  The Defendant apparently is working with a
8    patent attorney.
9
10   50.  **In furtherance of its scheme, persons controlling or directing the affairs of the**
11  **Enterprise I and II engaged in electronic eavesdropping to advance the**
12  **conspiracy.**  On March 31, 2018, Defendant Jennifer Lighter admitted to electronic
13  eavesdropping on the Plaintiff to understand his activities regarding the corporation by
14  leaving unattended devices with the Plaintiff.  The eavesdropping appears to have
15  occurred from at least 2016 through March 2018.  According to the Defendant Jennifer
16  Lighter  on May 17th, 2018, Defendant Miller Scheinkman instructed Defendant Ms.
17  Lighter to advance the conspiracy by illegally eavesdropping.  The Defendant stated
18  that she intended to record and hear conversations and phone calls related to the C
19  Corporation.    The Defendant admitted to wanting to hear conversations with an
20  individual involved in corporate fund raising and presentations who was helping raise
21  money for the company.  The Defendant admitted to listening to these recordings at
22  her place of work, NYU.  The eavesdropping via devices placed in the Plaintiff's office
23  area and in his car which had interstate travel.

24                              **COERCION**
25  51.  **In furtherance of the scheme, persons controlling or directing the affairs of**
26  **the Enterprises coerced the Plaintiff and further denied the Plaintiff his**
27  **Constitutional Rights.**  Enterprise I and II acted to prevent the Plaintiff from filing
28  grievances with the government thereby violating the Plaintiff's constitutional rights.
29  Both Enterprises have delayed proceedings for the best interest of the Defendants.  In
30  another instance, Enterprise I would give access to the children to non custodians
31  instead of the Plaintiff.  Members of Enterprise I presented an ultimatum to the Plaintiff
32  that if he did not consent to allow a trip with Defendants Gary Lighter and Jessica
33  Lighter (non-custodians), the Plaintiff would later be viewed as an unfit parent by the
34  Enterprise.  This trip was endorsed by the Defendants and Enterprise despite evidence
35  of active denigration of the Plaintiff by Defendants in question to the children.  This trip
36  further conflicted significantly with the Court Ordered parental time of the Plaintiff with

his children.  Since the event occurred, the Plaintiff has never been able to make up for
the repeated violations of the Court Orders and the Court has since only created more
threats and obstacles to Plaintiff's seeing his children.  In other instances, the Plaintiff
was subjected to arbitrary and unilateral decisions by the Defendants and the
Enterprise that forced the Plaintiff to not see his children.  In these situations, the
Plaintiff was then penalized for not seeing his children during these occasions and the
Court/Enterprise would then make negative statements on the record regarding the
Plaintiff which included statements about his ability to parent.  In other instances, the
Defendants defied Court Stipulations and parental rights by scheduling events for the
Plaintiff's children that would last weeks and sometimes months where the Plaintiff
could not see his children.  These decisions were not known by the Plaintiff nor was he
consulted until the decision had already been made.  Thus, the Defendant with the full
support of the Enterprise defied custody laws.   The Enterprise acknowledged the
defendants actions and still yet, turned a blind eye and allowed for these infractions
without any effort to correct or enforce New York State Law or its own stipulations.
The Plaintiff was denied his constitutional right as specified by the Fourteenth
Amendment so that he may be an active and significant part of their children's lives.
The loss of the Plaintiff's rights is unwarranted, constructed under false pretenses, and
could only occur with the cooperation of a Justice system that did not enforce the
constitution as specified here when a judge's spouse is able to manipulate legal
systems.  No State should infringe the rights of a parent to the direct upbringing, the
education and care of their children.  The Enterprise has infringed on a fundamental
right.

52. **In furtherance of the scheme, the persons controlling or directing the affairs
of the Enterprise allowed the Plaintiff to be subjected to various threats by the
Defendant without an opportunity to defend himself and being subjected to
assumed guilt**.  In this scheme, the Enterprise has allowed the Defendants to threaten
the Plaintiff via frivolous lawsuits and a false Temporary Protection Order.  The Plaintiff
continues to suffer presently from continued threats of a Temporary Order of
Protection, Motion 4, Motion 5, and Motion 6 with threats of incarceration, loss of
Constitutional Rights and financial penalties.  The Plaintiff continues to suffer presently
from continued threats by arbitrary and unsupported rejection of his responses to
these motions include but not limited to Affidavit in Opposition and Affidavit to Vacate
Default.  The Defendants further extended threats to the Plaintiff's reputation in his
community, his reputation as a citizen as well as his reputation as a business

1  entrepreneur by removing his right to defend himself.  Such visible threats to his
2  reputation are palpable but not limited to:  the Plaintiff has been subject to Homeland
3  Security interviews caused by the Defendants in the presence of third parties, the
4  Plaintiff has been subject to interferences to his role as a parent in public venues and
5  required supervision to attend meetings with his once common interactions with his
6  children's school personnel.  The Defendants subjected the Plaintiff to further
7  unwarranted complications regarding background checks as it relates to an
8  unwarranted, unheard, and temporary protection order that has no possible resolution
9  within the Enterprise as of three years as of this writing.  It is statistically an anomaly
10  within the State of New York to have a temporary protection order issued and renewed
11  under such claims without any ability to defend.

12  Motion 4 against Plaintiff purposely and willfully causes obstruction by
13  misrepresentation and omission of known acts by the Plaintiff and his counsel to satisfy
14  financial discovery.  This motion to seeking restitution to Defendants and penalize the
15  Plaintiff occurs despite the fact that the Defendants never satisfied financial discovery
16  to the Plaintiff.   The Enterprise allowed for unilateral enforcement  of the law,
17  falsification by the Defendants, and "cherry-picking" of facts.
18  Motion 5 against Plaintiff purposely and willfully omits signed stipulations by
19  Defendants and Plaintiff as a means of obstruction to cause a misrepresentation of the
20  Plaintiff's actions to support of a false depiction that the Plaintiff defied a temporary
21  protection order.
22  Motion 6 against Plaintiff which purposely and willfully intends to cause obstruction by
23  misrepresenting a third party website unknown by the Plaintiff.  It falsely depicts that
24  the  content of the website was designed and used as a device by the Plaintiff.   The
25  Defendants intended the misrepresentation of the Plaintiff's actions as evidence that he
26  defied a temporary protection order.  The Enterprise and Defendants are aware of
27  these facts, did not allow for appropriate investigation, yet allowed these matters to
28  assert significant threats and hardship on the Plaintiff.
29

30  53.  **In furtherance of the scheme, the persons controlling or directing the affairs**
31  **of the Enterprise have silenced the Plaintiff's legal voice thereby denying the**
32  **Plaintiff any ability to file a motion, hear the Plaintiff's motions, or grant a**
33  **hearing for the Plaintiff to resolve the matters**.  In this scheme, the Plaintiff has
34  been subject to coercion.  The Plaintiff has made almost a dozen written requests to
35  petition the Enterprise consistent with the direction of the Enterprise's own procedure.
36  The Enterprise has ignored every request.  The Enterprise has also actively rejected the
37  Plaintiff's responses to Motions and the Temporary Protection Order and thereby

1   subjected the Plaintiff to further coercion.  As the responses occurred within the
2   Enterprise but were handled by different individuals, the idea of coordination cannot
3   be ruled out.

4   54. **In furtherance of the scheme, persons controlling or directing the affairs of**
5   **the Enterprises I and II extorted the Plaintiff through various mechanisms in**
6   **order to coerce the Plaintiff to not report the crimes of Defendant Jennifer**
7   **Lighter, Defendant Miller Scheinkman, Defendant J. CAMBARERI; ultimately to**
8   **exhaust the Plaintiff financially, physically and emotionally; and ultimately to**
9   **influence the Plaintiff not to testify against the Defendants**.  The mechanisms
10  employed by the persons controlling the affairs of the Enterprise I and II involved the
11  Defendant's Motions against the Plaintiff whereby the Plaintiff has not been allowed to
12  defend against threats, continues to suffer from threats associated with the Motions
13  and whereby the Plaintiff has suffered from presumed guilt related to these motions.
14  On one occasion, the lawyers of the Plaintiff spoke with the Defendants and
15  subsequently drafted a document with clauses designed to protect the Defendants
16  from their crimes.  After the Plaintiff refused to sign the document, the Plaintiff's
17  lawyers stopped representing the Plaintiff.

18  55. **In furtherance of the scheme, the persons controlling or directing the affairs**
19  **of the Enterprise have coerced the Plaintiff to forgo medical care as the**
20  **Defendants have repeatedly removed/reduced the health care insurance and/or**
21  **coverage of the Plaintiff over three years which are violations of a New York State**
22  **Stay.**  The New York State Stay, granted in approximately May 2018, states that the
23  Medical Insurance Coverage of both the Plaintiff and Defendant should remain
24  unchanged prior to final resolution of the matter.  Deliberate indifference to serious
25  medical needs constitutes unnecessary and wanton infliction of pain as proscribed by
26  the Eighth Amendment.  The Defendants with permission of the Enterprise have
27  intentionally denied and delayed access to the Plaintiff's medical care and intentionally
28  interfered with treatment once prescribed.  The children additionally do not have
29  health care insurance as of 2020.  Defendant Jennifer Lighter reduced the Plaintiff's
30  health care insurance for 2019 which prompted the Plaintiff to notify the Enterprise in
31  writing and in sessions.  The Enterprise did not respond throughout 2019 to address
32  the violation of a Stay.  For 2020, the Defendant Lighter subsequently canceled the
33  Plaintiff's healthcare insurance altogether.  The fact that the Court took no action
34  throughout 2019 allowed for the Defendant to take further actions to remove Plaintiff's
35  health care insurance in 2020.  This negligence or intentional inaction by the Enterprise

created an opportunity for the Defendant Lighter and Miller Scheinkman to further coordinate the Plaintiff's loss of health care insurance in 2020.  The Defendants willfully misrepresented the Plaintiff's health care status.

On or around, September 2018, the Plaintiff had his first CAT scan to confirm his medical condition.  In November 2018, the Plaintiff underwent approximately 4.5 hours of surgery to fix his sinus condition.  In December 2018, Ms. Miller Scheinkman's client reduced the Plaintiff's medical insurance.  This election defied the Stay established in 2018 as defined in New York State Law.  The Enterprise was notified in Court Sessions, during off-record meetings as well as in multiple written communications with the Court.  To the benefit of Ms. Miller Scheinkman's client, the Enterprise took no action to protect the Plaintiff's health care rights and prevented the Plaintiff from seeking a legal means to redress.  In August 2019, the Plaintiff had a second CAT scan which confirmed his medical condition and need for additional surgery.  The report notes a significant bone loss in the sinus cavity as a result of his sinus problems.  In December 2019, the Plaintiff suffered from pneumonia due to his chronic sinus infections.  As of 2020, the Defendant has illegally removed the Plaintiff's health care coverage and as a result of this action, the Plaintiff has no ability to address his health care condition and he likely suffers from permanent damage due to his lack of health care.  As of May, 2020 the Plaintiff was at high risk with an ongoing sinus infection due to unaddressed health care need.  Even overlooking the Plaintiff's destitute status due to the racketeering activities, the Plaintiff required exposure to other high risk Covid 19 environments either due to needing to reapply for insurance or to undergo surgery out of pocket.

56. **In furtherance of the scheme, persons controlling or directing the affairs of the Enterprises I and II extended the conspiracy to prevent and negatively affect the Plaintiff's ability to exercise the Plaintiff's given rights to change venue to remove bias via Enterprise II**.

57. **On another occasion Enterprise II obstructed the Plaintiff from a change of venue action thereby forcing the Plaintiff to remain within the confines of Enterprise I.**  Enterprise II refused to provide the Plaintiff with an Index number many times with witnesses and evidence.  Thus the ability to file an action in the adjacent county as allowed per CPLR was denied by the Bronx County Clerk and by the Bronx County Clerk attorney (Rosetti) verbally with witnesses and evidence.  The Plaintiff's first attempt to file an order to Show Cause for a change of venue occurred on Tuesday September 17th 2019 at approximately 10am.  Rosetti stated that he was the only person capable of making this judgment whether the Plaintiff would be able to gain an index number in the Bronx for his Order to Show Cause.  On this day, he stated that he

1  would not allow the action to be submitted until he made a decision.  On two
2  subsequent phone calls, County Clerk Rossetti refused to allow for the submission.
3  One such call occurred on September 18th 2019 at 9:30am whereby County Clerk
4  Rossetti refused to allow the Plaintiff to submit the motion with his justification of "I
5  don't know you" and "I don't trust you" and he rudely hung up the phone.  On
6  September 23rd the Plaintiff returned to the Bronx Court House but was again declined
7  an index number by a specific person in the County Clerk's Office without reason.  The
8  refusal by the County Clerk directly contradicted staff in the motions department as
9  well as another department that handles submissions.  On September 25th, the Plaintiff
10  submitted a letter to Judge Gonzalez of the Bronx Court stating that the Plaintiff has
11  been denied the right to submit a motion and receive an index number.  The Bronx
12  Court did not reply. The Plaintiff challenged the County Clerk during the same day the
13  office falsified the date stamp of the submission; the misdating again would
14  significantly delay the submission.  After countless delays and refusals of more than a
15  month by Enterprise II, the Plaintiff successfully submitted but only after confronting
16  the County Clerk with witnesses to point out that the falsified date was identified on his
17  action and that the County Clerk's stamp used a false date on the Plaintiff's application.
18  In response, The Defendant Jackman, an employee of Miller Scheinkman's firm,
19  contacted the chambers of Enterprise II and subsequently the Enterprise II refused to
20  accept the legal motion.  The reasoning provided by Enterprise II was false but in
21  support of Defendant Jackman and Miller Scheinkman's requests.  An appeal would
22  require the Plaintiff to begin a length multiyear process, likely not advance the
23  Plaintiff's legal action, and further expose himself to the colleagues of Judge
24  Scheinkman.  The legal action thus was effectively silenced by the Enterprise.

25  58. **In furtherance of the scheme, persons controlling or directing the affairs of**
26  **the Enterprises coerced the Plaintiff to see and pay for a forensic psychologist for**
27  **over 5 months as a prerequisite to removing the Temporary Protection Order**.  Yet
28  despite the opinion of the psychologist favoring the Plaintiff, the Enterprise maintained
29  the Temporary Protection Order.   Ms. Miller Scheinkman and Judge Lubell later
30  completely discounted the forensic report recommendations which established that
31  the Plaintiff has a healthy and loving relationship with his children and that he should
32  have unsupervised visits to his children.

33  Further noted, Ms. Miller Scheinkman's communications to Jeff Kaplan, Plaintiff's
34  attorney at the time, in the summer of 2019 indicated that the home of the forensic
35  psychologist was destroyed in a fire and that all notes were destroyed; this destruction

of evidence would be beneficial to the Defendants.  It is unclear if this statement regarding the destruction of evidence by the Defendant is true.  It is unclear how the evidence was destroyed if the Plaintiff and Forensic Psychologist met at his office; nor is it clear how the Forensic Psychologist's notes which were taken electronically on a laptop computer in his office were all destroyed without any backup copies.  It should be noted that the Plaintiff submitted via email videos and notes of meetings with the children to the Forensic Psychologist.  The Plaintiff had witnesses of accounts which support statements by the Forensic Psychologist to indicate the Plaintiff is a good dad.

In particular, the forensic psychologist acknowledged that the report was to be used to address a Temporary Protection Order.  In particular, the Forensic Psychologist was aware that the Plaintiff had limited or no access to the children due to that Order.  In particular, the Forensic psychologist knew that his role would be instrumental in changing that access as dictated by Enterprise I.  In particular, the forensic psychologist told a story about the misuse of Temporary Protection Orders to the Plaintiff and the potential damage to the children.  In particular, the forensic psychologist made specific statements regarding detrimental effect of a child's psychological well being when deprived of a parent.  In particular, the Forensic Psychologist knew that actions by the Defendant Jennifer Lighter were damaging to the Plaintiff and their children.  As established on record, the Forensic Psychologist had a prior relationship with Judge Lubell and other members of the Enterprise and Defendants as members talked repeatedly about personal matters related to the Forensic Psychologist.

59. **In furtherance of the scheme, persons controlling or directing the affairs of the Enterprises coerced the Plaintiff to relinquish his lawyers and threatened to force the Plaintiff to hire new lawyers.**  On one such occasion, the Enterprise kicked out Attorney Peter Madison from a Court proceeding.  Mr. Madison, while not retained to represent the Plaintiff, was advising on matters related to his matrimonial proceedings and his company.  On another occasion, the Enterprise severed the attorney client relationship without the Plaintiff's knowledge, consent, or presence.  On other occasions, the Enterprise had private meetings with the lawyers of the Plaintiff and the Plaintiff's lawyers became less responsive and ultimately stopped representing the Plaintiff.

60. **In furtherance of the scheme, persons controlling or directing the affairs of the Enterprises coerced the Plaintiff to see his children under supervision and to undergo unjustified means of hardship to access his children.** The Supervision was mandated by the Enterprise under the guise of a Temporary Protection Order that has

provided no evidence that it is required and has not been granted a hearing.  In 2019, the Enterprise I mandated that the Plaintiff see his children under paid agency supervision based on the false statements in session of Defendant J. Cambareri.  This recommendation for paid agency supervision contradicts the recommendations of the report of the forensic psychologist which was required by the Enterprise.  The Enterprise repeatedly stated that the Forensic Report was the only prerequisite to removing the temporary order of protection and yet did not allow for the unequivocal findings and recommendations in the Forensic Report when the recommendations supported the Plaintiff's wishes to remove any type of supervision from his contact with his children.   The Enterprise and Defendants Miller, Jackman and Cambareri used process to obstruct the findings of the Forensic Report.

61.  **In furtherance of the scheme, persons controlling or directing the affairs of the Enterprises coerced the Plaintiff to be subject to countless threats via the Defendant's motions against the Plaintiff with the Enterprise's refusal to address the Temporary Protection Order with a hearing or the Plaintiff's Order to Show Cause.**

62.  **In furtherance of the scheme, persons controlling or directing the affairs of the Enterprise coerced the Plaintiff with an unheard frivolous Temporary Protection Order to create obstruction by impeding his ability to conduct financial discovery.**

63.  **In furtherance of the scheme, the persons controlling or directing the affairs of the Enterprise have coerced the Plaintiff to expand the Enterprise by coercing the Plaintiff to pay for and to allow for appointments of the Attorney for the Children, Forensic Accountant and Forensic Psychologist who maintain loyalty to the Enterprise for future income and appointments.**

64.  **In furtherance of the scheme, the persons controlling or directing the affairs of the Enterprise coerced the Plaintiff into a hearing of a Defendant's motions without adequate time to review, without adequate notice for a mandatory Court appearance and/or without adequate service.**

65.  **In furtherance of the scheme, the persons controlling or directing the affairs of the Enterprise have coerced the Plaintiff to defend himself through countless motions of the Defendant, represent himself through unheard motions and thus depriving the Plaintiff an opportunity to seek income.**  In this capacity, the Plaintiff

has been extorted for all assets that he has earned and created in addition to access to his children.  The Plaintiff has no choice but to represent himself or surrender to the whims of the Defendants and the Enterprise.

66. **In furtherance of the scheme, the persons controlling or directing the affairs of the Enterprise have attempted to further the conspiracy by expanding its members while giving the appearance of reducing their individual own accountability**.  Various members of the Enterprise have attempted to reassign their responsibilities to someone else in order to remove their exposure to the injustices and crimes contained herein; Judge Greenwald, Judge Colangelo, Referee Ratner and Judge Lubell have all attempted to shirk their responsibilities to allow for due process and have reassigned the case to other judges.  The transfer of cases requires coordination among those of the enterprise.

67. **In furtherance of the scheme, the persons controlling or directing the affairs of the Enterprise have caused the Plaintiff to exhaust all possibilities to seek remedy in the State of New York in order to further the conspiracy and ultimately coerce the Plaintiff to resign.**  The Plaintiff has filed motions with the local Court with no response, filed a motion to change venue to the Bronx with no logical response, filed many grievance letters with the Grievance Committee, filed letters with Administrative Judge Larry Marks, communicated with the Judicial Review Board, contacted Judge DeFiore, and further contacted the Attorney General.  Even Judge Lubell indicated he was aware of the Plaintiff's letters indicating active coordination within the enterprise.

68. **In furtherance of the scheme, the persons controlling or directing the affairs of the Enterprise have coerced the Plaintiff to judgements based on the Plaintiff's observation of previous direction from and agreements with the Enterprise.**  As an example, the Enterprise subjected the Plaintiff to denied access to his children and subsequently penalized the Plaintiff for not seeing his children during that same time period.  As another example, the Enterprise enforced the Temporary Protection Order since 2018 without review.  The Enterprise subjected the Plaintiff to not being able to access his work documents, intellectual property and intellectual property of the firm in order to work.  The Enterprise then penalized the Plaintiff for a lack of ability to present these documents.  As another example, the Enterprise enforced a temporary protection order which the Plaintiff complied with but prevented the Plaintiff from regaining his property which included hard copies of documents.  The Enterprise then subjected the Plaintiff to penalties for not providing hard copy documents located in his home.  The

1 penalties above have constituted financial injuries, preclusion, and additional
2 judgements against the Plaintiff.

3                                      **OBSTRUCTION**
4 69. **In furtherance of the scheme, persons controlling or directing the affairs of**
5 **the Enterprises committed obstruction and destruction of evidence in order to**
6 **further coerce the Plaintiff.** During February 2016, Defendant Jennifer Lighter was
7 left with hard drives that went missing despite being under the sole guardianship of
8 the Defendant Jennifer Lighter.  In another instance, during February 2016, the
9 Defendant Jennifer Lighter by her own admission violated electronic privacy laws.  The
10 Defendant illicitly gained access to an email account and corresponding calendar.  The
11 Defendant tried to destroy and erase all contents of the accounts.  The Defendant was
12 not entirely successful and only managed to destroy the work calendar of the C
13 corporation and a minimal amount of emails.  The Defendant accessed the Plaintiff's
14 bank accounts and other accounts of the Plaintiff to further coerce the Plaintiff legally
15 to ultimately forfeit his own assets to the Defendants.  Further occasions occurred
16 whereby Judge Lubell stated that statements that were being recorded by a
17 stenographer during an active Court session would not be "on the record".  In addition,
18 further attempts by the Plaintiff to recover transcripts of the Court sessions would be
19 indefinitely delayed or not responded to.  In other instances, the Enterprise would
20 blindly reject the petitions and evidence submitted by the Plaintiff to defend himself.
21 During these same occasions, the petitions and motions of the Defendants were
22 consistently accepted.  From 2018 through present, the Enterprise has obstructed the
23 presentation by the Plaintiff of key evidence in order to benefit the Defendants and
24 further impair and coerce the Plaintiff.  On September 11, 2019, the Enterprise stated
25 that it appeared to have lost or dismissed the Plaintiff's petition to challenge the
26 Defendant's allegations and establish his defense.  The Plaintiff submitted this petition
27 for emergency review in November 2018 and the Enterprise negligently or intentionally
28 refused to acknowledge or allow for its presentation and review.   In other instances,
29 the Defendants J. Lighter, F. Miller Scheinkman, and J. Jackman made false claims that
30 the Plaintiff had a history of "violence" as a direct means of obstruction.  They provided
31 statements of opinion to the Court as facts without substantiation or merit.  Such
32 statements incorrectly depicted the Plaintiff as "violent" when there is no history or
33 evidence. The Defendant and Enterprise both stated that the Plaintiff "abandoned his
34 children" despite the fact that he was their primary caregiver up until the temporary
35 protection order, and was prevented by both the terms of the Temporary Protection
36 Order and by the actions of Defendant Jennifer Lighter from having any significant

contact with the children.  Contrary to stipulations agreed to in open court, the
Defendant Jennifer Lighter repeatedly obstructed and interfered with the Plaintiff's
telephone and text communications with his children then claimed that he had
"abandoned" them.  The misstatements coordinated among the Defendants and by the
Enterprise forced the Plaintiff to undergo evaluation by a forensic psychologist.  As a
further application of obstruction, the Plaintiff has not been allowed to present the
Forensic Psychologists report.  Additionally, the Enterprise has instructed the Forensic
Psychologist to not communicate to the Plaintiff even to schedule Court time, which
contradicts previous practice.  The inability for the Plaintiff to coordinate or schedule a
Court appearance has obstructed the presentation of the Forensic Psychologist as a
witness in a scheduled Custody hearing.
On another occasion the Enterprise I obstructed the Plaintiff from the initial divorce
action thereby allowing the conspiracy to prepare and plan further. The Plaintiff's Index
number upon filing the Matrimonial Action was "lost" in the system by the Court in April
and May 2018; the index number was not provided to the Plaintiff for weeks which
delayed the Plaintiff's ability to serve papers.  Lawyers familiar with the Westchester
system state this index number loss is highly unusual and suspicious.  The delay by the
Westchester Court for the Index number could benefit the Defendant financially for
Social Security and other financial benefits.   In another instance, the Enterprise stated
that the Plaintiff's Order to Show Cause submitted in November 2018 was "lost" by the
Enterprise thereby contributing to the Defendant's scheme to obstruct.

70.  **In furtherance of the scheme, persons controlling or directing the affairs of
the Enterprise I further extended the temporary protection order through their
influential status.**  At a Family Court Session, Don and Dina Moss, Plaintiff's attorneys
at the time, observed Judge Greenwald of Enterprise I state on record that he did not
understand how and why the temporary Temporary Protection Order was issued given
its claims and statements by Defendant Jennifer Lighter but that he did not have time
to address it at the given session.  According to Don and Dina Moss, he asked "who
signed off on this?"

71.  **In furtherance of the scheme, persons controlling or directing the affairs of
the Enterprise I and II committed counterfeiting and perjury to mislead the
Enterprise and further threaten the Plaintiff's health, financial well-being, and
role as a parent.**  The Defendants J. Lighter J. Cambareri and Miller Scheinkman
provided false information to the Enterprise and the Plaintiff whereby the Plaintiff
suffered from loss of access to financial accounts, false information related to Plaintiff's
medical insurance coverage, and loss of access to his children.  The Defendants sought

to deceive in order to benefit financially by additional billing (via hours and Court appearances) associated with their deception as well as extending further risk to the Plaintiff to directly benefit the Defendant Jennifer Lighter. The Defendant J. Cambareri Lied and perjured herself to the Enterprise on various occasions to enforce and initiate further threats against the Plaintiff.  The Defendant Jennifer Lighter lied to the Enterprise in a successful scheme to deny the Plaintiff Federal and State Rights of the Plaintiff.  The Defendant Miller Scheinkman and J. Lighter perjured themselves on occasions whereby they made false statements on the record to the same Judge.

72.  **In furtherance of the scheme, the Defendants in cooperation with the Enterprise intended to make the Plaintiff homeless, financially destitute, physically sick, and emotionally distraught to devalue him as a potential parent and further threaten him.**

73.  **In furtherance of the scheme, the Defendants in cooperation with the Enterprise intended to falsely create a strategy to incarceration the Plaintiff to devalue him as a potential parent, reduce his ability to defend himself and further threaten him.**

74.  **In furtherance of the scheme, persons controlling or directing the affairs of the Enterprises obstructed by providing within the Enterprise false statements regarding the character of the Plaintiff.**  In one such scheme, Referee Ratner repeatedly referred to the Plaintiff as violent and further stated that she would let Judge Lubell know of the Plaintiff's violence despite the fact that the Plaintiff has no history or evidence of violence.  Likewise, Judge Lubell repeatedly made negative comments about the Plaintiff's character which violated Section 100.2 of the New York Rules of the Chief Administrative Judge which states that "a judge shall not testify voluntarily as a character witness".

75.  **In furtherance of the scheme, persons controlling or directing the affairs of the Enterprises obstructed the Plaintiff's due process by counterfeiting the submitted Court documents of the Plaintiff's submissions**.  Supported by evidence and witnesses, members of the Enterprise altered the Plaintiff's documents to invalidate the Plaintiff's submissions.  Supported by evidence and witnesses, members of the Enterprise misdated documents to cause delay of Plaintiff's submission to the Court.

76. **In furtherance of the scheme, persons controlling or directing the affairs of the Enterprises coerced the Plaintiff to leave his home, work, and abandon his children indefinitely by enforcing a Temporary Protection Order and ignoring all attempts by the Plaintiff to present evidence that would incriminate the Defendant and invalidate the Temporary Protection Order**.  The said Temporary Protection Order was issued in June 2018 without allowing for any hearing related to the said order and whereby allowing for a series of events that have further caused harm to the Plaintiff.

1. Issuance of Temporary Protection Order without ample evidence or substantial claims- under the advice of Faith Miller Scheinkman's Law firm
2. Using the said Temporary Protection Order to further deny requests of the Plaintiff's sister and children's grandparents to see or access the children.
3. Forcing the Plaintiff out of his titled home
4. Influence over Court to deny Plaintiff hearing for Temporary Protection Order in Family Court and in Supreme Court
5. Delaying proceedings to further extort and hurt the Plaintiff- The defendant attempted to deny, obstruct or interfere with the constitutional rights of the Plaintiff in order to profit themselves.
6. Using the Temporary Protection Order as a means to Violate intellectual property law
7. Using the Temporary Protection Order as a means to Deprive the Plaintiff of income
8. The Temporary Protection Order as a means to deny the Plaintiff a means to provide discovery
9. Violating Court-ordered stipulations related to the Protection of Order by the Defendants
10. Threatening the Plaintiff with out of pocket costs related to the said order
11. Threatening the Plaintiff with loss of custody of children, fines and imprisonment for contempt as a result of the said order
12. Ignoring previous stipulations to allow for significant threats and motions against the Plaintiff
13. *ex parte* communications related to the order
14. Presentation of false and misleading information to continue the said order.

77. **In furtherance of the scheme, the persons controlling or directing the affairs of the Enterprise have denied the Plaintiff's parental rights to further coerce the Plaintiff to negate his ability to exercise his Constitutional right as a parent**

**thereby placing the Plaintiff at a distinct disadvantage and cause the Plaintiff to be subject to financial penalties.**  One numerous occasions, the Defendants have sent the Plaintiff's children for non-emergency medical care and made non-emergency medical decisions without the permission or knowledge of the Plaintiff. One example is selecting psychologists for the children without the Plaintiff's knowledge or consent.

78. **In furtherance of the scheme, the persons controlling or directing the affairs of the Enterprise have further forced the Plaintiff to forgo the parts of the legal process that would provide protection and equitable treatment and coerce the Plaintiff into a Custody Trial prematurely.**   In this capacity, the Court has deprived the Plaintiff of custody prior to a custody trial.

79. **In furtherance of the scheme, the persons controlling or directing the affairs of the Enterprise have committed obstruction as demonstrated by their actions to ignore all attempts of the Plaintiff to seek an unbiased venue or to appeal for due process.**  The Plaintiff's requests for motions, filed motions, letters to the court and forensic report recommendations have either been denied or ignored without reason by the Enterprises.  In another instance, the multiple communications to J. Cambareri regarding the Plaintiff's children have been ignored by the Defendant for the benefit of the other Defendants J. LIGHTER and Miller Scheinkman.   The Enterprise has also denied the existence of Plaintiff's Order to Show Cause Motion (an emergency application) and also rejected the Plaintiff's Motions without review.  Such repeated and frequent disregard for the Plaintiff's attempts by the enterprise suggest active coordination.

80. **In furtherance of the scheme, the persons controlling or directing the affairs of the Enterprise have committed obstruction as demonstrated by their actions to ignore accounts and reports of witnesses.**

81. **In furtherance of the scheme, the persons controlling or directing the affairs of the Enterprise have attempted to move, alter, discontinue and access accounts belonging solely to the Plaintiff in order to misrepresent assets and benefit the Defendant financially.**

82. **In furtherance of the scheme, the persons controlling or directing the affairs of the Enterprise have committed obstruction by providing false statements without evidence and/or preventing the presentation of evidence contrary to the Defendant's false statements.**

**THREATS/EXTORTION**

83. **In furtherance of the scheme, persons controlling or directing the affairs of the Enterprises physically threatened, scared and stalked the Plaintiff**.  Many incidents occurred with the acknowledgement and written admission of the Defendants.  The Enterprise would not address these incidents despite filings with the Court.  The Defendants J. Lighter and G. Lighter would threaten by making references to Jennifer Lighter's grandfather's connection to well-known mobster Meyer Lansky. The Defendants stalked the Plaintiff at various geographic locations before from 2016 through 2019 as supported by witnesses and video.  The Defendant Jennifer Lighter threatened the Plaintiff in other instances by physically stalking the Plaintiff with evidence. The Enterprise itself has threatened the Plaintiff with incarceration based on false and unsubstantiated direction from the Defendants.  The Enterprise has allowed for the Defendants to further threaten the Plaintiff.  In another instance in approximately 2016, the Defendant Gary Lighter sneaked into the home of the Plaintiff, passed through three closed doors, intruded upon and scared the Plaintiff while he was taking a shower.  Similar intrusions occurred on other occasions.  On a separate occasion, the Defendant Gary Lighter and another woman also stalked the Plaintiff outside of the Court by showing up where the Plaintiff was eating lunch.  In July 2016, with witnesses, the Defendant Gary Lighter stated he would "ruin" and "destroy" the Plaintiff.  The Defendant Gary Lighter held Plaintiff's mother by her neck in an intimidating way while making these statements. The Defendant Jennifer Lighter acknowledges in writing the offensive behavior.  The Plaintiff presented an *ex parte* application to Enterprise I of harassment in 2018; the Enterprise responded with delaying the Plaintiff in Court and with Defendant Jackman being notified of the application.  The Defendant Jackman appeared for the application and the Court dismissed the application without allowing the Plaintiff to speak about the matter. When the Plaintiff told Defendant Jennifer Lighter that he was considering divorce, the Defendant stated that he would never see the children again if he did.  Defendant Jennifer Lighter intended to inflict emotional harm on Plaintiff and has carried out these plans as demonstrated by the past few years.

84. **In furtherance of the scheme, persons controlling or directing the affairs of the Enterprises psychologically threatened and scared the Plaintiff**.   The Plaintiff has been further threatened via messages through his own children delivered by the Defendants.  The Enterprise has further threatened the Plaintiff by loss of access to his children by "off record" Court orders to threaten the Plaintiff's standing as a custodial

parent in order to cause the Plaintiff to acquiesce to the demands of the Defendants. In June 29, 2017, prior to the Plaintiff's legal action, the Plaintiff wrote a letter to the Defendant Gary Lighter to state how the Defendants Gary Lighter and J. Lighter have collectively tried to threaten, control and intimidate the Plaintiff.  The Defendant Gary Lighter had screamed and threatened at the Plaintiff at his sons recital and made physical attempts to threaten the Plaintiff's mother.  The Defendant Gary Lighter also would trespass on the Plaintiff's property, enter the residence, pass through many closed/locked doors and scare the Plaintiff while in the shower or bathroom on more than one occasion.  These events are recorded and admitted to by the Defendants. In another instance, even after the Defendant Jennifer Lighter filed a Temporary Protection Order, she would taunt, physically approach and follow the Plaintiff.  The actions demonstrate her willingness to threaten the Plaintiff with additional penalties of violations but also further demonstrate her sworn false statements in support of the Temporary Protection Order.

In another instance, as acknowledged and admitted to by the Defendant Jennifer Lighter, the Defendant repeatedly harassed the Plaintiff.  The Defendant's actions attempted to provoke the Plaintiff to help substantiate a further claim on a   temporary protection order.  The Plaintiff did not respond to these acts by the Defendant despite consistent attempts by the Defendant.  On other occasions, the Defendants and Enterprise threatened to block access and remove parental rights from the Plaintiff. The Defendant Gary Lighter and Defendant Jennifer Lighter have executed a multiyear plan to illegally revoke parental rights of the father (the Plaintiff) and have culturally monopolized the children under illicit schemes as executed by the Enterprise.

85. **In furtherance of the scheme, persons controlling or directing the affairs of the Enterprises financially threatened and scared the Plaintiff.**  The Enterprise has enforced financial penalties against the Plaintiff and has made additional financial threats against the Plaintiff to include but not limited to loss of patents, loss of intellectual property, loss of his titled home, loss of premarital possessions, loss of control of his own exclusive financial accounts.  Likewise, the Plaintiff is subject to IRS tax penalties as a direct consequence of his inability to defend himself from the financial threats.  On or about 2015, the Defendant Gary Lighter demanded that I take a loan out from him instead of a bank for the financing of the Plaintiff's property.  The Plaintiff declined and the Defendant Gary Lighter became visibly angry and intimidating.  The Defendant Gary Lighter would often make what he would say

1   "generous" financial offers which were often introduced to control and intimidate the
2   Plaintiff.
3
4   86.  **In furtherance of the scheme, the persons controlling or directing the affairs**
5   **of the Enterprise hid their behavior with "off record" meetings with the Plaintiff**
6   **as well as "off record" Court orders and "off record" threats against the Plaintiff.**
7   Off record proceedings allowed for further obvious coordination of the proceedings by
8   the Enterprise: Lubell, Ratner, Colangelo, Faith Miller Scheinkman and Jennifer Jackman.
9   The Enterprise would not allow a stenographer to be present yet would issue directives
10  and threats to the Plaintiff.  Another example, included Ratner who at the direction of
11  the Defendants threatened to arbitrarily discard the information of the Plaintiff's actual
12  income and instead impute income as a means of determining financial ratios.

13  87.  **In furtherance of the scheme, the persons controlling or directing the affairs**
14  **of the Enterprise have directly extorted the Plaintiff by subjecting the Plaintiff to**
15  **threats of Motion 4,5,6, ignoring all attempts by the Plaintiff to address the**
16  **allegations, and exercising a default against the Plaintiff to compel a payment to**
17  **the Defendants.**
18
19  88.  **In furtherance of the scheme, the persons controlling or directing the affairs**
20  **of the Enterprise have directly extorted the Plaintiff through the Defendant's**
21  **Motions. The persons controlling or directing the affairs ignored attempts by the**
22  **Plaintiff to address the allegations, include key facts, allow for perjury that has**
23  **further hurt the Plaintiff and/or allowed these motions or portions of these**
24  **motions to remain unresolved as a means to further threaten the Plaintiff.  Many**
25  **of these motions remain as active threats to the Plaintiff.**
26
27  89.  **In furtherance of this scheme, the Enterprise's refusal to resolve issues act as**
28  **continued threats against the Plaintiff.  Moreover, the Enterprise's willful lack of**
29  **resolution of matters have caused significant and risk towards the Plaintiff's**
30  **health and well being especially in light of the Covid-19 and in light of the**
31  **Plaintiff's need for surgery despite the Defendant's unlawful discontinuation of**
32  **the Plaintiff's healthcare insurance.**  The Plaintiff has been without his titled home
33  that was purchased with premarital assets.  However, the Plaintiff has not been able to
34  gain any resolution by the Enterprise and instead has been homeless and at times
35  without a place to sleep.  During the spring of 2020, the Plaintiff was subjected to
36  undue risk to Covid-19 as he was forced to stay without options in one of the highest

transmission hubs in the U.S. The consequences of the Defendant's actions have threatened the Plaintiff's well-being by needlessly exposing him to environments that he would not have been subjected to given his titled home.  Even in the presence of a vaccine for Covid-19, the Plaintiff would be without healthcare insurance or financial means in the event of an adverse event.  This undue risk puts the Plaintiff at unnecessary preventable risk due to the actions of the Defendants and the willful actions of the Enterprise.

90. **In furtherance of the scheme, the persons controlling or directing the affairs of the Enterprise have extorted the Plaintiff when the Plaintiff was observing the Enterprise's judgments.**  In one instance, the Enterprise allowed for unilateral decisions by the Defendant that obstructed the access to his children.  The Enterprise then allowed the Defendants to extort and coerce the Plaintiff based on his inability to see his children.  In another instance, the Enterprise allowed for the Defendants to illegally block the Plaintiff from access to financial documents and accounts.  The Defendants then used this blocked access to further threaten and coerce the Plaintiff.  In a second instance, the agreed upon stipulations stated that there would be no prejudice for the Plaintiff's inability to see his children due to supervisor's lack of availability.  At the direction of the Defendants F. Miller Scheinkman and J. Jackman, the Enterprise subsequently allowed for numerous threats and penalties against the Plaintiff for the Plaintiff's activity which activity was compliant with these Court endorsed stipulations.

91. **In furtherance of this scheme, the Enterprise's refusal to resolve issues act as continued threats against the Plaintiff.  Moreover, the Enterprise's willful lack of resolution of matters has caused significant financial damages to the Plaintiff; this latter willful behavior acts as a way to further extort the Plaintiff and cause him to ultimately resign all interest in his property or rights.**

## **1962 D ADVANCE CONSPIRACY**

92. **In furtherance of its scheme, persons controlling or directing the affairs of the Enterprise I planned and prepared to advance the conspiracy in violation with 18 United States Code Section 1962 d.**  In one instance with evidence and witnesses, the Defendant Jennifer Lighter stated to a third party Jim Kelly of Purchase Day Camp that the Court Enterprise I had made an order to prevent him from seeing his children.  As of that time, to the knowledge of the Plaintiff, the Enterprise had not yet received any documentation nor had made any decisions regarding this custodial limitation.  In a

second instance, the Enterprise apparently notified the Defendant's law firm of an *ex parte* application of the Plaintiff; the Enterprise delayed the Plaintiff from his *ex parte* meeting with the Family Court Judge to file a harassment suit against the Defendant Jennifer Lighter and G. Lighter.  The Enterprise suspiciously asked the Plaintiff to wait in a separate room, after a significant delay, despite being the first litigant to show up that morning and check in with the Court personnel, Plaintiff was then released to find out that the Defendant J. Jackman appeared in the *ex parte* session.  The Family Court Judge (Hon. Gordon-Oliver) subsequently dismissed the Plaintiff and his application based on the request of the Defendant J. Jackman and did not consider the application.  In a third instance, the Defendant Jennifer Lighter admitted she was told to illegally eavesdrop on the Plaintiff by Defendant Faith Miller Scheinkman; thus, the scheme had been designed well in advance of the action.   The Defendant subsequently obtained one or more devices specially designed to record the conversations of the Plaintiff while he was working alone in his office.  In a fourth instance, on or around 2017, the Defendant Jennifer Lighter appears to have been in contact with a patent attorney which may be related to the Plaintiff's pending patents for the biotechnology company.  In a fifth instance, on a date that the parties had been directed to appear ready for trial, with witnesses, Referee Ratner was observed having *ex parte* communications with Defendant F. Miller Scheinkman and discussing strategies to remove the Plaintiff's witnesses from the courtroom.  In this instance, witnesses observed the Defendant and the Enterprise in lengthy conversation.

93. **In furtherance of its scheme, persons controlling or directing the affairs of the Enterprises I and/or II have routinely encouraged proposed settlements to preserve the Defendant's illegal activities from scrutiny by the Enterprise or other authorities.**  In this capacity, the Enterprise would meet privately with the legal representation of the Plaintiff without the presence of the Plaintiff.  On one such occasion, the Plaintiff's own legal representative suggested after meeting with the Defendants and the Enterprise that the Plaintiff sign an agreement to waive the right to pursue the Defendants Miller Scheinkman and J. Lighter for their criminal behavior. It is believed that the intimidation occurred while in a private conference with Judge Lubell with the Plaintiff's counsel that the Plaintiff himself was not allowed to attend.  On at least two other occasions, the Plaintiff's own legal representative would not contact the Court to address the wrongdoings of the Defendant Jennifer Lighter after meeting with members of the Enterprise privately.  It is believed that the Defendants and/or Enterprise intimidated the Plaintiff's lawyers as the lawyers themselves contradicted themselves by not subsequently filing the violations and the Defendants interfered with the representation of the Plaintiff.  Thus, the persons controlling or directing the affairs

of the Enterprise caused the Plaintiff further financial hardship of the Plaintiff while removing and/or reducing his ability to defend himself.

94. **In furtherance of the scheme, persons controlling or directing the affairs of the Enterprises did further the conspiracy by not enforcing the New York Rules of the Chief Administrative Judge to include but not limited to Section 100.2 and 100.3**.  Such lack of enforcement allowed the Enterprise to "advance the private interests" of others and to ignore "information indicating a substantial likelihood that a lawyer has committed substantial violation of the Rule of Professional Conduct" as in the case of Defendants Miller Scheinkman and Jackman. Defendant Cambareri, Defendant Miller Scheinkman, and Defendant Jackman's lies, which represent a violation of Section 4.1 Truthfulness In Statements To Others of the Rules of Professional Conduct (22 NYCRR Part 1200) and were not recognized with investigative or disciplinary action.

95. **In furtherance of its scheme, persons controlling or directing the affairs of the Enterprise I and II have engaged in *ex parte* communications to advance the conspiracy against the Plaintiff with numerous examples**.  On February 26th, 2020 Defendant Jackman stated on the record to Judge Koba that she had sent a communication regarding the Plaintiff's proceedings prematurely and made reference to the communication on a prior day.  The Judge Koba assignment was first announced only minutes earlier by Judge Lubell for the first time.  Defendant Jackman had *ex parte* knowledge about the newly assigned Judge prior to the announcement from the Court while the Plaintiff was unaware of the new Judge Assignment.  On a second occasion, Judge Lubell stood outside the Court house to hold a conversation with Defendant J. Cambareri post the appearance of the Plaintiff in the Court House.  On a third occasion, Defendant Miller Scheinkman was scribing notes to Defendant J. Cambareri during the Plaintiff's active court session in front of Judge Lubell.  Defendant Miller Scheinkman was apparently writing a response for Defendant J. Cambareri for Judge Lubell's questions.  On other occasions, the Court would require appearances of the Plaintiff's counsel with instruction that the Plaintiff would not be permitted to attend.  The Plaintiff's lawyers subsequently refused to address the Court with further violations of conduct within the Court or actions of the Defendants.  On other occasions, the Defendants would be privy to information that violates *ex parte* standards of the Court. This imbalance of information would serve to not only injure but further create an inability for the Plaintiff to protect himself and allow for further coercion of the Plaintiff by the Enterprise.  On a fourth occasion, the Plaintiff was purposefully delayed by Court

House officials for a Court appearance for hours when he was scheduled for a meeting with the Judge early.  Conveniently hours later, the Defendant, Jennifer Jackman of Faith Miller Scheinkman's firm appeared despite the fact that no other parties knew of the Plaintiff's exparte scheduled appearance in the Court.  The Plaintiff was not allowed to then present his case.

96.  **In furtherance of the scheme, the persons controlling or directing the affairs of the Enterprise have forced the Plaintiff to leave his home, the surrounding area and disappear to protect himself from unlawful acts of and threats from the Defendants and/or the Enterprises.**  The Plaintiff has been subjected to threats of incarceration, and financial threats while being deprived without due process of all of his assets and access to his children.  The Plaintiff has been forced to disappear to prevent more false claims, any acts of entrapment or obstruction, and to be able to file a federal action in order to protect his own rights.  The Plaintiff has also disappeared in order to be able to heal physically post infection and after a second round of surgery.  The Plaintiff intends to seek due process without being subject to the ploys and threats of the Enterprises or Defendants.

In one such circumstance that depicts the types of threats to the Plaintiff, the Enterprise threatened the Plaintiff.  This threat occurred after the Plaintiff notified the Court that he was diagnosed with pneumonia and a severe sinus infection which would interfere with a Court Date that same week.  The Plaintiff, who was *pro se*, presented a Cat Scan report and a physicians letter supporting the Plaintiff's claims prior to the Court appearance.  The Enterprise led by Judge Lubell was fully aware of the medical condition of the Plaintiff and yet willfully threatened the Plaintiff despite his medical condition.

The Defendants have filed false claims against the Plaintiff as mentioned elsewhere in this complaint and the Enterprise denied the Plaintiff his right to defend himself;  thus, the Plaintiff has been forced to disappear in order to prevent more false unheard claims against the Plaintiff.  Based on his documented experience in the Courts, the Plaintiff fears for his own well being in the Westchester and Bronx Courts for fear of judgments based on false statements, obstruction and lack of due process.

Likewise, the Enterprise at the whim of the Defendants have placed the Plaintiff in situations whereby the Plaintiff would be subject to schemes of entrapment with potential penalties of arrest, loss of custody or financial fines.  These situations include:
      1. Situations in Court Houses whereby the Plaintiff was stalked by the Defendant

Jennifer Lighter so it would give the appearance that the Plaintiff was violating the protection order.   2. Situations whereby the Defendant would lie about Court Orders to a third party in order to threaten the Plaintiff 3. Situations in which the Defendant would willfully defy Court Orders (without future penalty) and place the Plaintiff in situations whereby he would be forced to either not see his children or not follow a Court Order.  While the Plaintiff has only followed the Court Orders and has avoided committing actions that are not consistent with the Orders and Court directives, he remains fully aware that any slight deviations from these Orders would put the Plaintiff at undue risk (arrest) and without an ability to defend himself legally due to the relationship of the Enterprises and Defendants.

97.  **In furtherance of the scheme, the persons controlling or directing the affairs of the Enterprise communicated via *ex parte* communications to further their scheme.**  At times, the Defendant exclusively communicated to the Court and enterprise through *ex parte* communications which has been observed with witnesses.

    1   These communications were observed by various individuals including Don Moss, the Supervisors, Jeff Kaplan and Plaintiff.  Likewise,the communications were verbally admitted by some of these individuals.  These communications were also stated on record.

    2  These *ex parte* communications among the parties to the Enterprise were done to further debilitate the Plaintiff throughout the proceedings

        i  Scheduling last minute Court dates to further damage the Plaintiff via contempt charges.

        ii  To discuss means to remove the Plaintiff and his witnesses from the Court Room on December 19 2019

        iii  Defendant Faith Miller Scheinkman Scripted the Court appointed attorney for the Children during Court sessions to act against the Plaintiff.

98.  **In furtherance of the scheme, the persons controlling or directing the affairs of the Enterprises have bestowed special unilateral privileges to the Defendants in order to forward the conspiracy.**  In this perspective, the Defendants were provided with immunity from prosecution for violating State laws and Federal laws.  In another perspective, the Defendants were allowed by Enterprise to file motions against the Plaintiff and Plaintiff was not allowed to file his own motions.   In another perspective, the Enterprise overlooked the failure of the Defendants to provide financial discovery while penalizing the Plaintiff for his own actual delivery of financial discovery.  The Enterprise allowed for preclusion against the Plaintiff whereby the

Plaintiff would not be allowed to receive financial discovery from the Defendant.  In another perspective, the Enterprise would prevent a hearing requested by Plaintiff since 2018 on the validity of the Temporary Protection Order while allowing for countless other Court appearances requested or demanded by Defendants.

In another perspective, the Enterprise unilaterally granted rights to the Defendants that were not granted to the Plaintiff.   For example, the Enterprise allowed for adequate service to be done electronically by the Defendants and yet did not allow the *pro se* Plaintiff to have the same privilege.  The Enterprise knew that the Plaintiff was homeless or staying at friends and needed to travel hours to see his children and attend Court sessions.  Thus, the additional responsibility of service as a *pro se* litigant without electronic delivery created an unilateral disadvantage to the Plaintiff.

99.  **In furtherance of the scheme, the persons controlling or directing the affairs of the Enterprise have allowed the Defendants Miller Scheinkman, Jackman and Lighter to further the conspiracy by allowing for exclusive immunity from New York State Law and repeated violations by the Defendant against the Plaintiff.**  The Enterprise itself has been influenced to cherry pick issues at the Plaintiff's expense and offer exclusive exceptions to the Defendants Miller Scheinkman, Jackman, Cambareri and Lighter.  In this capacity, the Enterprise has ignored the crimes including but not limited to theft, conversion and eavesdropping.  In addition, the Enterprise has taken actions against the Plaintiff that relied on false and perjurious statements of the Defendant that are contrary to New York State Law.  Even acknowledging the fact that the statements were false, the Enterprise offered no investigation nor issued any warnings to the Defendants.  It is an obvious conclusion that the Enterprise's complicity in allowing for proven perjury could only be extending protection and implied immunity to any of the Defendants from consequences of their own crimes.  Thus, whether the allowance for this illicit behavior was explicitly arranged beforehand or implicitly allowed establishes coordination against the Plaintiff. In another example, the Enterprise ignored emergency requests to the Court to protect the assets of the Plaintiff during high risk events.  The Enterprise failed to respond to gas and water emergencies that the Plaintiff had no chance of addressing due the unheard Temporary Protection Order.  The Defendant did not maintain the Plaintiff's asset and yet the Plaintiff had no means of addressing the problems.  The Plaintiff asked the Enterprise to have access to his home that is his asset, not the Defendant Lighter's, and the Enterprise did not respond.

100. **In furtherance of the scheme, the persons controlling or directing the affairs of the Enterprise further obscured and obstructed the Plaintiff's status in terms of legal representation, financial condition and living status to make him more vulnerable to future threats.**  One such example is to make the Plaintiff appear as if he had legal counsel when in fact he was *pro se*.

101. **In furtherance of the scheme, the persons controlling or directing the affairs of the Enterprise further caused intentional infliction of mental distress and deprivation of his right to interact with his own children.**  The Plaintiff was blocked from regular access to his children by the Defendants and Enterprise.  The Enterprise further blocked the Children and the Plaintiff from celebrating religious and cultural holidays.  The Judge during these times would have unilateral conversations with the Defendants about holidays they share while excluding the Plaintiff.  While this may be construed as a smaller point, it can not be overlooked as it further shows that the conspiracy was held together and led by cultural exclusivity.  In another instance, the Enterprise created impossible hurdles for the Plaintiff to be able to interact with, call or see his children.  In yet another instance, the Enterprise created situations whereby he followed the "off record" instruction of the Court and then was penalized during Court sessions for following that behavior.

102. **In furtherance of the scheme, the Enterprise including Judge Lubell and Referee Ratner demonstrated acts of racism and supremacy.**  Similar acts of supremacy and racism were observed by the Defendants and likewise were conveniently obscured only when a stenographer was present or actively working.  These acts were demonstrated via exclusionary language to imply favoritism towards individuals of like-mind and cultural similarity.  Even the suggestion of these exclusive acts by the Defendants and Enterprise together with latter actions as mentioned in this complaint imply that cultural exclusivity/supremacy represents another motive.   Thus in context, in addition to the political, financial and marital relationships it was also cultural bias that drove the civil rights violations and illicit decision making within the core of the enterprise.

103. **In furtherance of the scheme, the Enterprise and Defendants collectively blocked the Plaintiff's extended family from seeing or accessing the Plaintiff's children.**  These family members include the great grandmother (now deceased), grandparents, cousins, and aunt/uncle to the children.  Even the children's aunt, a quadriplegic, was denied access to the Plaintiff's children.

104. **In furtherance of the scheme, the Enterprise and Defendants collectively threatened action against the Plaintiff's extended family on and off record.** It is well established that these threats further impeded their ability to maintain a relationship with the Plaintiff's children. The Enterprise willfully allowed for these threats by the Defendants.

105. **The Enterprise has acted as a functional protectorate of the Defendants at question to prevent submission of incriminating evidence and further threaten the Plaintiff.** Essentially the Enterprise and its public servants are serving their own interests at the price of democracy and justice.

The Enterprise bestowed unique legal privilege to the Defendants and other members of the Enterprise as demonstrated by unilateral enforcement of the law and "cherry-picking". Thus the Enterprise itself denied equal protection under the law; willful actions by the Court demonstrate that the Court manipulated and enforced only laws that were beneficial to the Defendants. Adherence to Federal law, State law, previous court orders, and agreements were only enforced to the benefit of the Defendant. The Defendant Miller Scheinkman who is the wife of a judge holds immunity from prosecution or investigation. The presiding judge has no vested interest to enforce the law against his bosses wife and thus any parties that support the causes against the Defendant. Thus the adversaries of the Defendant Miller endure reduced civil liberties that prevent them from either making claims against the opposing party or defending themselves legally.

106. **"Temporary Protection Order Scheme":** Even overlooking the fact that the original protection order was based on false statements, it would not be allowed by most Judges as it provides no real acts or threats and there exists a body of evidence to refute its exact claims. The Temporary Protection Order is merely a ploy designed to seek retaliation against the Plaintiff who filed for divorce 7 weeks earlier and to separate the Plaintiff from his children and assets. The Defendant made false statements to the Court; the Enterprise prevented the Plaintiff to ever legally disprove the false claims in the Order. These means to obstruction of due process include repeated prevention of a hearing and by not allowing any review of the Plaintiff's evidence. Under this false pretense, this Temporary Protection Order has been willfully renewed more than dozens of times by the Court and willfully maintained by the Enterprise despite countless written attempts by the Plaintiff to request a hearing or due process. The protection order is a tool by the Enterprise to misrepresent and

1    coerce the Plaintiff which has been used to separate him from his children and assets
2    while forcing him into a forced conspiracy.

3    No temporary protection of this caliber based on frivolous claims and the presence of
4    evidence would ever be perpetuated unless it is was done under obstruction to prevent
5    a fair and timely due process.  The conduct of the enterprise constitutes considerable
6    Civil Rights Violations and served as one of the first tools used against the Plaintiff by
7    the Defendants with cooperation of the Enterprise.   In another aspect, the Defendants
8    misrepresented the protection order to include the children when it did not even
9    include the children.  In another aspect the Court knew of this misrepresentation and
10   took no action against the Defendants.  In this aspect, the Defendants knowingly and
11   willfully misrepresented Court proceedings to defy Court direction for the Plaintiff's
12   access to the children.

13   On another occasion, a second protection order was filed by the Defendants when no
14   Defendant was even present to witness the claimed events.  The Enterprise allowed this
15   second protection order and also further prevented the children from seeing their
16   father despite the Plaintiffs numerous attempts to address the initial false claims of the
17   first protection order.  Likewise, according to Referee Irene Ratner, Judge Colangelo
18   refused to consolidate the temporary protection order originally filed in the Family
19   Court with the Supreme Court Matrimonial action.  It is unknown whether this refusal
20   was a decision by Judge Colangelo or a misrepresentation by Irene Ratner.  Irene Ratner
21   specifically stated, we don't consolidate temporary protection orders into an ongoing
22   action in this court house.   At one point, neither Court would allow for review of the
23   temporary protection order or allow any hearing or the presentation of any evidence.
24   The Plaintiff's attempt to contest the protection order was met with constant delays
25   whereby the Court would delay and prevent the Plaintiff from having an opportunity to
26   ever address the Temporary Protection Order from June 2018 to present day.   Either
27   way, the inability and delays by the Enterprise and Defendants to delay and prevent
28   consolidation of the temporary protection order caused financial damages and
29   unneeded hardship to the Plaintiff while giving the Defendants substantial privileges.
30   Likewise, this use of the temporary protection order was used to conduct unlawful
31   seizure of assets,  deprivation of constitutional rights, and a complete disregard for
32   parental rights.  The Enterprise further tried to obscure this scheme through
33   misrepresentation and abuse of electronic systems to give a false appearance that it
34   was resolving this issue.

107. **"Stealing Corporate secrets Scheme"**  The Defendants admitted to using recording devices to ascertain corporate information which includes but not limited to using illegal recording devices, stealing corporate property, unlawfully disseminating corporate property, engaging a patent attorney for apparent continued theft of corporate documents, and unlawfully engaging lawyers for review of the Company's intellectual property assets.  The Defendant has admitted to some of these crimes already.

108. **"Forensic Psychology Report Interpretation Scheme"**  The Defendants and the Enterprise willfully and purposely forced the Plaintiff to undergo a forensic exam as a result of the said temporary protection order.  The Plaintiff was then subjected to numerous interviews that lasted hours on each day and the Plaintiff and children were subjected to interviews.   The Enterprise in the person of Judge Lubell misstated the contents of the forensic psychologists report and then denied the Plaintiff's access to the report and the ability to contact the psychologist himself thus preventing the Plaintiff from contesting the false statements.

109. **"Silencing the Plaintiff's legal voice"**  No motion that has been filed by the Plaintiff or his counsel has ever been allowed to be submitted by the Enterprise. Responses to motions were often dismissed for "technical reasons" then not allowed for resubmission.  In desperation, the Plaintiff even emailed the documents to all parties to show he had made efforts to satisfy the Enterprises process.  The Enterprise did not accept motions or response to affidavits due to the fact that the evidence provided would incriminate the wife of the Judge Lubell's boss.  Court procedures and/or conduct of the Enterprise corroborate that the Enterprises ability to silence the Plaintiff for the benefit of the Defendant are unconstitutional.  Even the Plaintiff's action was denied by Enterprise II.  In this capacity the Enterprises have violated the First Amendment which allows the right of the people "to petition the Government for a redress of grievances".  Actions of the Enterprises as well as Judge Scheinkman's policy which is characterized as "permission-based" or "negative gatekeeping" regarding motion practice is a means of abridging or prohibiting the right of a citizen to petition the government for a redress of grievances.  Likewise, the Enterprise denied the right of access to the Courts thereby preventing the Plaintiff as a petitioner to seek an exercise by the government of its powers in furtherance of the interest and prosperity of the Plaintiff.

110. **"False Service Scheme" The Enterprise employed false service schemes as part of a means to injure the Plaintiff.**  To limit the scope of this claim, limited

examples are provided.  Despite repeated attempts to correct misrepresentations by the Enterprise and Court, the Plaintiff would fix errors at the County Clerks office so that service of Court documents against the Plaintiff would be served appropriately. Despite evidence and witnesses to show that these errors were fixed on numerous occasions, the Plaintiff would subsequently find these misrepresentations.  These misrepresentations directly benefited the Defendants and gave the appearance of adequate service to those who were not aware of the misrepresentations. In another instance, the Enterprise and Court would allow for service to a quadriplegic's home in another state as a means of providing service.  The Enterprise allowed this behavior though it contravenes CPLR procedures in the State of New York. In another instance, the Enterprise delivered papers without ample time to review prior to review papers. In another instance, the delivered papers were different than the papers presented to the Court.  The Court as part of the Enterprise were aware of these circumstances in each case and willfully allowed the Defendants to proceed at the expense of the Plaintiff.

111.  **"Court Scheduling Scheme as a means to injure Plaintiff"  The Enterprise employed illegitimate schemes regarding Court Scheduling and electronic means to cause the Plaintiff undue risk.**  The plaintiff on numerous occasions would receive less than 24 hours notice or be notified after hours during a weekend for a Monday morning Court appearance when the Court knew that the Plaintiff was denied access to his home and was forced to stay at locations that were often hours away from the Plaintiff due again to the protection order scheme.  Failure to appear was stated by the Enterprise as judgments including financial penalties and incarceration.  The Plaintiff in this situation was forced to appear and often pulled all-nighters to review motions and draft responses.  These situations occurred many times.  The Plaintiff also suffered from added legal costs during these events.  The Plaintiff was also notified of ghost Court dates whereby the Plaintiff would show up and wait almost all day.  The Guards would state that there was nothing listed on the schedule.  The Plaintiff would then find at later dates that the Court had proceeded and yet never allowed the Plaintiff to appear on the record.  To outside viewers this would give the appearance that the Plaintiff was absent and give the Court additional authority.  On other occasions, the Court provided false dates to give the appearance that the Plaintiff did not need to attend.

In yet another instance, the Enterprise itself acting to delay and prevent due process at the benefit of the Defendant.  Early on in proceedings, the Plaintiff attempted to file an

1  *ex parte* application for a protection order against Defendants G. Lighter and L. Lighter.
2  Upon entering the Court and meeting with the Clerk, the Plaintiff was initially told he
3  would have a first appearance with the Judge at approximately 9:30am.  As the Plaintiff
4  was waiting he was then told that he would have to fill in a blank piece of paper
5  answering questions which were already addressed in the Court form.  The Plaintiff was
6  asked to wait in a separate area and asked to wait hours though others which were
7  after the Plaintiff in line, were already meeting with the Judge on similar matters.
8  When the Plaintiff's name was called, Defendant J. Jackman mysteriously appeared and
9  entered the Plaintiff's *ex parte* session whereby she represented Defendants Jennifer
10  Lighter and G. Lighter and asked the Judge to dismiss the case which the Judge did.
11  The Plaintiff was never able to provide any means of providing facts to the Court and it
12  is clear that the Court who were the only participants with knowledge of the Plaintiff's
13  Court presence provided communication to Faith Miller Scheinkman's firm.

14  112.  **"Forced Response to Motion Scheme"  The Enterprise would force the**
15  **Plaintiff to review newly presented motions against the Plaintiff and make**
16  **decisions without allowing for the Plaintiff's preparation;  thus placing the**
17  **Plaintiff under duress since he only had brief intermissions to review material.**
18  One example, is Judge Lubell forced the Plaintiff to review a motion written by the
19  Defendants which was hundreds of pages long during an intermission after the Plaintiff
20  notified the Court/Enterprise that he had not seen the motion filed by the Defendants.
21  Judge Lubell forced the Plaintiff to review during a break and present his defense
22  within an hour approximately.  These situations occurred in the presence of Irene
23  Ratner and documents show the forced actions caused the Plaintiff to sign statements
24  such as "under duress" next to his signature.  Many times, it was positioned by the
25  Enterprise to the Plaintiff to submit to a certain decision including financial decisions to
26  benefit the Defendant in order to see his children again.

27  113.  **"Forced Custody Hearing Scheme as a coordinated means to injure Plaintiff**
28  **when the Plaintiff has already lost functional custody due to an unheard**
29  **Temporary Protection Order"**  Despite the Plaintiff's repeated attempts (written and
30  in Court hearings) to request a hearing for the temporary protection order, Judge
31  Lubell chose to instead force a Custody hearing while Plaintiff was under the temporary
32  protection order which would put the Plaintiff at a severe disadvantage.  As a further
33  means, the Plaintiff has had his functional custody unlawfully removed by the
34  Enterprise in coordination by the Defendants.   Judge Koba, who is already aware of the
35  Plaintiff's situation and loss of functional custody as well as the temporary protection

1  order, is hosting a hearing under false and unconstitutional pretenses.  Judge Koba
2  constitutes a tool of the Enterprise as she is carrying out the orders and wishes of
3  Judge Lubell and as such is a tool of the Defendants.  Judge Koba is a member of the
4  Enterprise.

5  114. **"Scheme to Exclude the Plaintiff while Forcing private meetings with**
6  **Plaintiff's legal counsels"**  Again, to favor Faith Miller Scheinkman's firm, Judge Lubell
7  scheduled meetings with the Plaintiff's lawyers and prevented the Plaintiff from
8  attending these meetings.  The Plaintiff would then find his own lawyers intimidated
9  and subsequently refuse to show up to the Court again despite owing the Plaintiff
10  considerable capital.  In another instance, a lawyer providing support to the Plaintiff
11  was ordered by Judge Lubell and by Irene Ratner to leave the Plaintiff during this
12  meeting.  The result of these meetings would cause the Plaintiff's lawyers to become
13  scared and intimidated as demonstrated by not filing motions that had already been
14  agreed to or not showing up to Court or not engaging the Court in writing as had been
15  requested by the Plaintiff.   At one point, the Enterprise even removed the Plaintiff's
16  counsel from representing the Plaintiff without consulting the Plaintiff.

17  115. **"Scheme to use electronic Court systems to misrepresent the Plaintiff to**
18  **outside parties in terms of legal representation and adequate service"**  The
19  Enterprise itself misused and misappropriated electronic systems to misrepresent the
20  Plaintiff.  These include but are not limited to misrepresent that the Plaintiff was *pro se*
21  and thus service was granted to his lawyers instead of himself.  Court  scheduling was
22  also manipulated to benefit the Defendants.

23  116. **"Off record schemes designed to threaten and coerce the Plaintiff"**  The
24  Plaintiff was forced and threatened in many instances in off record meetings whereby
25  Judge Lubell made the Plaintiff place the phone in the center of the table before issuing
26  the threat.  Ironically, the Defendant Jennifer Lighter was not given the same
27  instructions during these meetings.  In other instances, the Defendants would demand
28  that the Plaintiff provide most recent balance information and then the Judge would
29  empty his accounts by commanding him to pay certain bills.  Despite the fact that the
30  Judge was notified of the Plaintiff's financial hardship, he told the Plaintiff that if he did
31  not find the money, he would not see his children again.  These off record schemes
32  became so obvious and abusive that the Plaintiff notified the  Enterprise in writing that
33  he would not show up unless there was a court stenographer present to record the
34  proceedings so that he had protection.

1   During these meetings the Plaintiff was forced to pay disproportionate sums that were
2   not reflective of income or means or income ratios as is typically done by the Court in
3   practice.

4   As another aspect off-record scheme, Referee Ratner would choose "professionals" to
5   provide their "professional opinion"  These individuals include the children's lawyer and
6   the forensic psychologist.  Upon seeing the conduct of the prior proceedings, the
7   Plaintiff requested a conflict of interest process to take place to ensure these
8   individuals were not legally conflicted; the Enterprise, specifically Irene Ratner, refused.
9   Ofcourse, unplausible circumstances would follow these chosen individuals.  With
10  respect to the forensic psychologist, the Plaintiff was forced to use a forensic
11  psychologist which was supposedly designed to clear the protection order.  A witness
12  who interacted with the forensic psychologist observed the forensic psychologist
13  stating that the children loved seeing their dad and there was nothing to worry about
14  as he has a healthy relationship with his children.  The forensic psychologist observed
15  the children climbing across their dad, wanting to wrestle, see who could punch dad
16  the hardest, and asking them to read with them.  The forensic psychologist later would
17  have a mysterious house fire which was claimed would destroy evidence to benefit the
18  Plaintiff despite the fact that all his conversations were recorded on a computer.  Prior
19  to a hearing, the Plaintiff attempted to contact the forensic psychologist to indicate
20  whether he would be present for the trial.  The forensic psychologist stated that he was
21  unable to interact with the Plaintiff (*pro se* at this time) under direction of the Court.
22  The forensic psychologist would also not meet with the family members of the Plaintiff
23  but did meet with family members of the Defendant.  The forensic psychologist did not
24  provide any accounts for the negative acts of the Defendant Lighter in the report
25  despite having electronic evidence of such events.  Judge Lubell forced the Plaintiff to
26  pay the forensic psychologist despite the fact that he had willful knowledge that the
27  Plaintiff did not have the money.  Judge Lubell told the Plaintiff to "find the money" or
28  you "wont see your children"  in a private session without a stenographer.  Judge Lubell
29  also misrepresented the forensic report findings on the record and provided an
30  uncorroborated narrative to the benefit of the Defendant and the detriment of the
31  Plaintiff.  When the Plaintiff, stated that the facts were not indicated in the report. Judge
32  Lubell bullied and threatened the Plaintiff.

33  The lawyer for the children Joann Cambarari would later be observed having *ex parte*
34  communications in the Court house with Defendants in front of a stenographer in a
35  Court Room session in front of Judge Lubell which the Plaintiff verbally pointed out. In

1 another instance, Joanne Cambareri would claim in a meeting that she would take legal
2 action against anyone that recorded the children during the Divorce.  She specifically
3 said that she would take legal action against the Plaintiff if he did so or anyone else.
4 The Plaintiff subsequently sent evidence that Defendant Jennifer Lighter was recording
5 the children post Defendant's conversation with the Plaintiff.  J. Cambareri took no
6 action nor would acknowledge the act despite the fact that the actual recordings and
7 admission were emailed to Defendant Cambareri.   Judge Lubell also tried to prevent
8 the Plaintiff from stating such on the record as he would bully the Plaintiff regularly
9 during sessions by holding the idea of parenting as not a given right.  Judge Lubell has
10 stated on a few occasions that certain items from Court Room Sessions would not be
11 on the record.

12 Judge Lubell manipulated and caused the deletion of statements made in open court by
13 the Plaintiff.

14 117. **"Deadbeat Dad Scheme"** From the inception, Judge Lubell had presented the
15 Plaintiff as a deadbeat dad who has abandoned his children.  A deadbeat Dad does not
16 write this complaint *pro se*.  At one point, he asked the Plaintiff if he should ask the
17 children what they thought of their dad?  When the Plaintiff responded yes, Judge
18 Lubell responded that if he did that it would show that the Plaintiff has complete
19 disregard for his children.  In another instance, he commanded the Plaintiff to not
20 challenge denied time with the children that should have been assigned to the Plaintiff
21 and stated that if the Plaintiff did not agree, he would be consider the father unfit as a
22 parent.  In another instance, the Plaintiff was  accused of calling child protective
23 services on the Defendant.  During the Plaintiff's absence from the children, the
24 Plaintiff's younger son suffered three broken bones while solely under the Defendant's
25 care as the Plaintiff was not allowed any access to his children.  The Court (Enterprise I)
26 knowingly acknowledged this information and yet still never took any action against
27 the Defendant nor even inquired about the incidents.  The Enterprise I also did not
28 pursue any of the Defendants actions that violated New York Laws, ,Federal Laws,
29 Stays, Court Direction or Court Orders that further prevented the Plaintiff from
30 accessing his children.

31 From the perspective of the children, the children have the right to avoid dislocation
32 from the emotional attachments that are derived from the intimacy of daily association
33 with the Plaintiff.  The Enterprise allowed for unlawful destruction of this intimacy of
34 daily interaction and never allowed the Plaintiff to address these concerns.  Thus, the
35 Enterprise caused estrangement of Plaintiff and the children despite the fact that the

Plaintiff was the adult who spent the most time with the children prior to the temporary protection order scheme.

118. **"Forced Financial Duress Scheme"**  The Enterprise denied the Plaintiff financial information and compensation from the Defendant.  The Enterprise denied the Plaintiff the right to sell his home which is titled only in his name.  The Enterprise denied the Plaintiff the right to maintain his home even in the presence of several "emergencies" that seemed out of place and appeared to be ploys constructed by the Enterprise and Defendants to entrap the Plaintiff to go on his own titled property which would have violated the Temporary protection order.  Then the Defendants hired contractors to fix the so called emergency without the knowledge or consent of the Plaintiff and then an exorbitant bill that the Defendants tried to assign to the Plaintiff.  In yet another instance, the Defendants submitted offers of settlement to the Plaintiff that were not only unrealistic or unattainable but financially impossible.  Again, these are threats of future financial duress which remain plausible given the extent of the effort by the Defendants and Enterprise. In other instances, the Plaintiff was forced to sign documents in the meeting to which the Plaintiff signed "under duress" next to his signature.  Throughout the process, the Enterprise created hardships for the Plaintiff to access his assets, maintain his assets, and represent his assets.  Throughout the process, the Enterprise prevented any rights normally bestowed to a litigant to access information of the Defendant that would potentially provide for financial protection.

119. **"Arrest and Incarceration Schemes to further control and threaten the Plaintiff"**  The Enterprise and Defendants created and coordinated numerous attempts to attempt to trick the Plaintiff into an arrest and incarceration.  None of these attempts were successful but caused financial and emotional distress to the children and the Plaintiff and the extended family.  These include but are not limited to instances listed here.

    A.  The Defendant violated Court Orders regarding the children and  if the Plaintiff went to see children due to these violations to see the children, he would have violated the temporary protection order.

    B.  Motions against the Plaintiff while not allowing for submission of evidence or witnesses in opposition.

    C.  Judgment form with optional incarceration not checked nor crossed off the list which was inconsistent with other items listed on the form.  Thus, it provides the impression that incarceration or arrest is still possible.

120. **"Entrapment Scheme to further threaten and damage the Plaintiff: "** During off-record meetings the Enterprise and Defendants would either agree to certain provisions or force certain actions on the Plaintiff.  Subsequently, the Enterprise would penalize those actions of the Plaintiff.  Saving for brevity, examples include but are not limited to:  access to the children, discovery, and financial responsibilities.   These agreements were enforced to favor the Defendant only and placed no responsibility on the Defendant to fulfill duties and responsibilities set forth by the Enterprise.  Likewise, the Enterprise would give misrepresentation that the Plaintiff never satisfied his responsibilities despite significant efforts on his part.  On other occasions, the Defendants would visibly damage the titled property of the Plaintiff to solicit a response from the Plaintiff.  Other than trying to appeal to the Court, the Plaintiff did not approach his own property.

The Plaintiff has been stalked and followed by the Defendant Jennifer Lighter while the Defendant supposedly was under a protection order in the Court house.  On many occasions the Defendant would run and approach the Plaintiff to give the appearance that the Plaintiff was violating the protection order.  The Plaintiff would run away from the Defendant before the Defendant could get close to the Plaintiff.  On one occasion, the judge asked for a private meeting with the lawyers and asked the Plaintiff and Defendant to leave.  Of course, the Plaintiff was put in a situation whereby the judge created an opportunity for the Defendant to put the Plaintiff at risk for violating a protection order.  Once the Plaintiff walked out of the Court room, the Defendant aggressively stalked and followed the Plaintiff within the Court House. The Plaintiff was forced to run away and never interacted with the Defendant.  The Plaintiff was scared that he would be accused of breaking the temporary protection order when the Defendant Jennifer Lighter was aggressively pursuing the Plaintiff.  Once the Plaintiff reached a police officer in the hallway, the Defendant Jennifer Lighter left the scene.  The officer responded that she was aware that the situation obviously looked like a setup to entrap the Plaintiff.  Accounts, evidence and witnesses support other instances of entrapment with similar patterns.

121. **"Scheme to Switch Judges to reduce Culpability:"**  Judge Lubell committed acts that are not befitting to the bench but representative of acting as a member of the Enterprise and an agent of the Defendants.  To reduce culpability and his personal risk, he elected to step away from a hearing .  Judge Koba's role in future proceedings is indicative of an expansion of the Enterprise and a means for Judge Lubell to distance himself from the unconstitutional acts that he supported and committed.   By

1  reassigning the case, Judge Lubell also shirked his judicial responsibilities to investigate
2  the Defendants of their acts of perjury and investigate the illegal acts of his bosses wife
3  within his own Court Room.  Judge Koba has already been present in Judge Lubell's
4  sessions whereby Judge Lubell has inserted false information, helped the Defendants
5  via obstruction, denied due process, allowed for false statements including perjury by
6  the Defendants and further issued an decision to force a premature hearing for
7  custody during the time when the Enterprise had already issued a functional loss of
8  custody.  Judge Koba would not have the ability to remain objective and thus any Judge
9  under Lubell would feel compelled to enforce his prior decisions and acts.   Despite
10  being aware of the perjury of the Defendants, Judge Koba has further avoided any
11  investigation into the perjury of the Defendants that would be instrumental to
12  ascertain whether a custody hearing would be appropriate.  The protective manner by
13  which Judge Lubell has been protected by Judge Scheinkman via Faith Miller
14  Scheinkman can be extended to the relationship of Judge Koba to Judge Lubell.  Thus
15  the extension of the Enterprise provides for the same logic that has been demonstrated
16  by the protective nature of Judge Lubell towards his bosses wife, Faith Miller
17  Scheinkman.  The Plaintiff has already experienced past behavior and acts to indicate
18  that a judge in this Enterprise seldom disagrees with a prior judge or a judge higher in
19  the hierarchy despite the facts.  These statements of bias have already affected the
20  Plaintiff negatively and a switch of judges in this matter is not a solution but just a ploy
21  to reduce personal culpability while subjecting the Plaintiff to unjust bias while he has
22  been subject to the loss of constitutional rights.

23  122. **"Scheme to take evidence from Plaintiff"**  Members of Enterprise II took no
24  action nor would file a complaint despite reported crimes.  The Enterprise II members
25  did not investigate or allow the Plaintiff to file a complaint.  Members of Enterprise II
26  stated that they would like to get key items of evidence from the Plaintiff related to
27  Faith Miller Scheinkman's crimes.  The evidence clearly demonstrates Defendant
28  Jennifer Lighter admitting to the fact that Defendant F. Miller provided guidance and
29  advice to commit a criminal act.  Thus, members of Enterprise II asked for the evidence
30  and yet would not provide any assurances of the whether they would assure the
31  Plaintiff that the evidence would be returned, accessible or transferred in the event of
32  another investigation.   Thus, the members of Enterprise II had no intention of filing a
33  complaint and sought to control the evidence against Faith Miller Scheinkman and her
34  husband, Judge Scheinkman.  The members of Enterprise II stonewalled, stalled and
35  even encouraged the Plaintiff to "call every day" as a reminder but took no meaningful

1  action towards seeking any resolution as it appeared their political interests were more
2  important than their legal interests.

3

### ***COUNTS***

### **COUNT I**
#### **RICO § 1962(c)**

123.  **Plaintiff incorporates by reference all the preceding paragraphs of this Complaint as if fully set forth herein.  The allegations of paragraphs are incorporated herein by reference.**

124.  **This Count is against Defendant(s) Faith Miller Scheinkman, Jennifer Jackman, Jennifer Lighter, Gary Lighter, Jessica Lighter, Joanne Cambareri and the law firms Guttridge & Cambareri, PC and Miller Zeiderman & Wiederkehr LLP (the "Count I Defendant(s)").**

125.  **The Defendants violated RICO and Plaintiff was injured as a result.**

126.  Each Defendant violated 18 U.S.C. Section 1962(c) by the acts described in prior paragraphs and as further described.

127.  Enterprise I (Westchester Court and the Westchester County Clerk's Office) is an enterprise engaged in and whose activities affect interstate commerce of Mico Bio Inc. and that of the Plaintiff.

128.  In this capacity, the enterprise referred to is the vehicle through which the pattern of racketeering is committed.

129.  The Count I Defendant(s) are employed by or associated with the enterprise.

130.  The racketeering acts were committed at the behest of, or on behalf of, the enterprise.  The racketeering acts had the same or similar purposes, results, participants, victims or methods of commission.

131.  **The ongoing threat of continuity indicates an open ended scheme to threaten and extort the Plaintiff via various actions**.   The threat of continuity is well established as the predicate acts or offenses are part of Defendant's ongoing regular way of doing business.  The pattern of the racketeering activity demonstrated a relationship and the threat of continuing unlawful activity.   Proof of such continuity plus relationship is well established within pending actions of the Enterprise and the Defendant.  Such continuity is easily established by the pending motions (5&6) against the Plaintiff, the default order of Motion 4, and the temporary protection order that has

52 out of 75

1  never had a hearing yet has penalized the Plaintiff from June 2018 to the present date.
2  The Defendant currently has manipulated the enterprise to issue ongoing threats of
3  incarceration and financial penalties.
4  In addition, there has been no resolution on matters related to the Plaintiff's personal
5  and real property, corporate property and Plaintiff's access to his children due to the
6  unlawful continuing activity of the Defendant and her firm.  The Defendant has been
7  able to control not only the proceedings legally but control the pace of the proceedings
8  to delay them at the Plaintiff's direct cost.
9  Many of the enumerated racketeering acts still actively threaten the Plaintiff.  A brief
10 summary is included here to demonstrate patterned behavior with examples and
11 evidence that can be found in the Counts section of this application.  A few examples
12 that are more recent demonstrate the Defendant's use of false information in the way
13 of perjury to threaten me with punitive damage.  The false information conflicts with
14 the Court's own knowledge and physical documentation.  However, the Defendant's
15 influence over the Enterprise has precluded the Plaintiff's defense and thus the threats
16 of motions with significant damages remains intact.  Thus these actions represent
17 obstruction of justice as a means of presenting false information as well as extortion by
18 way of threatening the Plaintiff with incarceration and substantial financial penalties.
19 Unrelated third parties have stated that the Defendant has undue influence over the
20 Court due to her husband.  It is likely and plausible that the racketeering activity has
21 been replicated on unrelated cases and will continue through the foreseeable future.
22 Thus, the threat of continuity is sufficiently established where the predicates have and
23 can continue to be attributed to the Defendant and the Enterprise operating as part of
24 a long-term association that exists for criminal purposes.
25
26 132.  **Predicate Act:  Use of Fraud within Bank, Mail and Wires to Defraud Plaintiff**
27 **in Violation of 18 U.S.C. Sections 1341, 1343. And 1344**
28 Defendants committed acts constituting indictable offenses under 18 U.S.C. 1341 and
29 1343 in that they devised or intended to devise a scheme or artifice to defraud the
30 Plaintiff in order to obtain money from the Plaintiff by means of false or fraudulent
31 pretenses and representations.  For the purpose of executing their scheme, Defendants
32 caused delivery of various documents and things by the U.S. mails or by private or
33 commercial interstate carriers or received such therefrom.  Defendants with the same
34 intent to defraud Plaintiff also caused fraudulent pretenses and representations to be
35 transmitted by means of wire communications in interstate or foreign commerce.  Mail
36 and Wire Fraud Statutes were violated whereby the defendants executed schemes to
37 defraud the Plaintiff of tangible and intangible property rights.
38 The Defendants violations of 18 U.S.C. Section 1341 (relating to mail fraud) include but
39 are not limited to sending false information regarding health care insurance coverage

and interception and theft of mail addressed to the Plaintiff.  The Defendants violations are also corroborated by the acts related to medical information.  The Plaintiff received an email from the Defendant's employer that falsely portrayed the Plaintiff having seen a psychiatry clinic at NYU.

The Defendants violations of 18 U.S.C. Section 1344 18 U.S. Code § 1961 include but are not limited to bank fraud which according to the bank where the accounts are located occurred by the Defendant's movement of the Plaintiff's exclusive account to her account profile.  The Defendants planned to defraud the Plaintiff and the enterprise by falsely representing this account as property of the Defendant.
In another example, there is reasonable foreseeability that wires will be done to satisfy the financial penalties against the Plaintiff to enrich the Defendants Miller Scheinkman and Lighter.  The Plaintiff has already made payments based on false statements by the Defendants.

133.  **Predicate Act:  Defendant's false statements in use of Plaintiff's passports**
Violation of 18 U.S.C. Section 1542 (relating to false statement in application and use of passport)
The Defendants forced the Enterprise to require the Plaintiff to relinquish his passport information through Financial Discovery.  The Defendants subsequently used false statements in conjunction with his Passport information to contact Homeland Security.  According to Homeland Security, while Plaintiff was en route to Sweden, a Homeland Security officer told Plaintiff that the Defendants  communicated with Homeland Security to allege that the Plaintiff was a "flight risk".    Homeland Security subjected the Plaintiff to be withheld and interviewed while traveling due to the false statements of the Defendants.  The Plaintiff has since been denied Global Entry and it is upon belief that the Defendants have compromised the Plaintiff's application.  The Temporary Protection Order was mentioned by the officer in the airport with specific mention of the Defendant Lighter as the person who filed the complaint.  Thus, the Temporary Protection Order and further false statements by the Enterprise are false and have been used as a further opportunity to harass or intimidate the Plaintiff.  A second situation occurred when the Plaintiff's car was hit by a third party.  Three police cars showed up evidently due to the false claims of the temporary protection order.

134.  **Predicate Act:  Defendant's interference with monetary transactions and accounts of the Plaintiff to willfully and falsely portray ownership of real estate asset.**
Violation of 18 U.S.C. Section 1957 (relating to engaging in monetary transactions in property derived from specified unlawful activity)  The Defendant subsequently placed

these accounts in her own name, removing Plaintiff's name from them without consent.

135. **Predicate Act:  Defendants' Obstruction including perjury, false statements to officials, destruction of evidence,**

Violation of 18 U.S.C. Section 1503 (relating to obstruction of justice)

1   Throughout 2018 to present, the Plaintiff presented evidence and witnesses to show that statements made by the Defendants were false.

2   The Plaintiff's Index number upon filing the Matrimonial Action was also lost in the system by the Court in April and May 2018; the index number was not provided to the Plaintiff for weeks which delayed the Plaintiff's ability to serve papers.

3   The Defendant Miller Scheinkman and her firm willfully obstructed Plaintiff's access to the courts and committed perjury.  The Defendant Faith Miller Scheinkman on at least two occasions in Court sessions and via motion 5 falsely claimed that the Plaintiff filed complaints with Child Protective Services and by doing that violated the Temporary Order of Protection.  As the identity of the person making complaints with the agency is protected by State Law, the statement is false but the Enterprise did not reprimand or warn the judge's wife of her conduct and instead allowed her to file a motion against the Plaintiff for threats of Contempt, Financial Penalties of $10,000 as well as assuming all legal fees of the Defendant Jennifer Lighter.

4   Defendants of Miller Schienkman's law firm refused to take service

136. **Predicate Act: Defendants' interference with commerce, robbery, or extortion**

Violation of 18 U.S.C. Section 1951 (relating to interference with commerce, robbery, or extortion)

1   Use of Temporary Protection Order to gain exclusive access to office

2   Missing Hard drives

3   Illegal recording devices used to steal information regarding the Corporation.

4   The Enterprise levied fines and threats against the Plaintiff as

137. **Predicate Act:  Defendants' Attempt to convert Assets of the Company through Obstruction:**  Violation of 18 U.S.C. Section 1510 (relating to obstruction of criminal investigations), Violation of 18 U.S.C. Section 1511 (relating to the obstruction of State or local law enforcement)

1   Perjury

1.a False and deceptive Statements to officials regarding the possession and location of the Corporate Documents

                   a.i  The Defendants intentionally made the false representations in order to induce the Plaintiff to pay additional monies to the Enterprise, to threaten the Plaintiff via the Enterprise and to ultimately cause the Plaintiff to forfeit Corporate property and his individual property.

                   a.ii  The RICO Defendants knew their statements were false and misleading when made

                   a.iii  The Plaintiff was aware that these statements were false

                   a.iv  The Plaintiff notified the Court of the false representations

                   a.v  The Court ignored the Plaintiff's written and verbal complaints

                   a.vi  The Court issued further negative Orders

                   a.vii  The Plaintiff suffered from these Orders

                   a.viii  The Plaintiff's children suffered from these Orders.

              1.b Destruction of evidence

2   The Defendants used the enterprise to protect themselves from litigation by the Plaintiff and the firm by controlling proceedings of the Plaintiff through the Enterprise.

3   In this capacity, the Enterprise denied or delayed the access to transcripts by Court Reporters

4   Additionally, the Defendant Miller Scheinkman "through" the enterprise had a purpose of profiting by providing false information and delaying proceedings and maintaining active billing of her client while extending financial penalties to the Plaintiff.

138. **Predicate Act:  Defendants' Attempts to convert the Plaintiff's property through Counterfeiting**

Violation of 18 U.S.C. Sections 471, 472, and 473 (relating to counterfeiting)

1   Counterfeiting- The Defendant Faith Miller Scheinkman has aided her Client in counterfeiting to present documents to the Court that have been either forged or contain information that is false

              1.a The Defendant of the Client has altered Corporate Documents

              1.b The Defendant of the Client has accessed bank records to misrepresent their status

              1.c The Defendant of the Client has manufactured false information regarding debt and equity positions of the C Corporation of which the Plaintiff is a major shareholder.

              1.d The Defendant presented false medical insurance information to the Plaintiff in February 2020 to give the appearance that the Plaintiff had medical insurance coverage and obscure the fact that Defendant had

1          violated a Court Ordered Stay numerous times.

2     1.e The Enterprise I altered documents of the Plaintiff to prevent the
3        submission eligibility to the Court.  In this case, the Enterprise removed
4        tabs on the submitted motions after the Judge requested tabs on the
5        motion papers as a prerequisite to submission

6     1.f The Enterprise II altered documents of the Plaintiff to prevent their
7        submission to the Court.   In this case, the Enterprise misdated
8        documents of the Plaintiff to prevent their submission to the Bronx
9        Court.

10

11 **139.  <u>Predicate Act:  Defendants' Attempts to deny the Plaintiff's rights through</u>**
12 **<u>Witness Retaliation</u>**

13 Violation of U.S.C. Section 1512 (relating to tampering with a witness, victim, or an
14 informant), section 1513 (relating to retaliating against a witness, victim, or an
15 informant)

16     1   Witness Retaliation- Retaliating against a witness or supervisor for the
17      children/oppose statements made by the Attorney for the Children.

18         a.i   Christa Percopo provided evidence and accounts of experiences
19            with the children on phone calls and in email to the Court
20            appointed attorney for the Children.

21         a.ii   These accounts provided evidence of damaging behavior of the
22            Client of the Defendant.

23        a.iii   Pastor George, Father Elias, Christa Percopo, David Leis, Helen
24            Leis, Doug Rankin and Ann Rankin provided accounts and
25            testimony of their experiences with the Plaintiff and the Plaintiff's
26            children to the forensic psychologist

27         a.iv   Many of these experiences documented potentially damaging
28            and illegal activities of the Defendant's Client.

29         a.v   The Attorney for the Children (Court appointed attorney for the
30            Children) subsequently recommended these individuals should
31            be removed as supervisors of the Plaintiff's visits to the children.

32         a.vi   The Court appointed attorney for the Children disregarded and
33            failed to report all reports that were contrary to the assertions or
34            interests of Defendant's Client.

35        a.vii   On December 19th 2020, Christa Percopo, David Leis, Pastor
36            George, Father Elias were kicked out of the Court Room by
37            Enterprise member Judge Lubell.

38       a.viii   These witnesses were not allowed to present evidence that was
39            incriminating to the Defendants.

a.ix To the present day, all of the Plaintiffs motions since the Plaintiff filed the action in April 2018 to provide evidence to the Court and seek due process were rejected and dismissed without reason.

140. **Predicate Act:  Defendants' attempts and actions regarding Larceny Theft, Misuse and distribution of Trade Secrets**

Violation of 18 U.S.C. Sections 1831 and 1832 (relating to economic espionage and theft of trade secrets),

Violation of 18 U.S.C. Sections 1833-1839 the Economic Espionage Act of 1996 (18 U.S.C. Sections 1831-1839)

Violation of the Defend Trade Secrets Act of 2016  (18 U.S.C. § 1836)

1 Larceny/Theft of Corporate Documents and Intellectual Property including drafts of patents:  On or around June 2018.

1.a The Defendants Lighter, Miller Scheinkman, and Jackman committed violations and crimes contravening the Economic Espionage Act of 1996 (18 U.S.C. Sections 1831-1839) and Defend Trade Secrets Act of 2016 by the misappropriation of trade secrets which includes violations of conspiracy to misappropriate trade secrets, the subsequent unlawful acquisition and dissemination of such trade secrets.

1.b Theft of Trade secrets via Eavesdropping which includes the ownership and use of illegal recording devices to discover proprietary information of the firm. Financial, business, scientific, technical issues, prototypes, and other means that are property of the firm.

1.c Stealing and illegal dissemination of the Corporate Documents

1.d The Defendant engaged an Intellectual Property Lawyer with a specialty on the same area of science as Mico Bio Inc., the C Corporation whose intellectual property was stolen.

1.e Withholding the intellectual property from the Plaintiff

1.f Demanding the Corporate Patents be assigned to her Client

1.g Judge Lubell allowed the Defendants to pursue the Patent attorney of the C corporation to relinquish intellectual property of the C corporation to the Defendants.

2 The Defendant Miller Scheinkman further advised her client to commit eavesdropping across state lines and to further potentially listen to conversations with callers who were located in other states and countries in 2018 and as early as 2016.

3 On March 31, 2018, Defendant Jennifer Lighter, under the direction of Defendant Miller Scheinkman, admitted to eavesdropping on the Plaintiff to understand his activities regarding the corporation.

4   On a similar date, the Defendant Ms. Jennifer Lighter admitted to lying to prevent discovery of the eavesdropping.

5   On July 19th, 2019, Plaintiff stated that the affidavit signed by Defendant and produced by Defendant's firm conflicts with their own statements regarding their possession of C corporation documents made in open court.   Judge Lubell avoided the topic and told Plaintiff to sit down and stop talking about the matter.

6   As compared to their own previous statements in open Court as well as their own client's affidavit, the Defendant's firm has also lied on record regarding the location and dissemination of these documents to third parties.  The Defendant's law firm has had the corporate documents and research since July 2018 to the best of the Plaintiff's knowledge. Despite the Plaintiff's numerous communications to request action or to inform them of the sensitive nature of the documents, the Court has not provided direction to allow Plaintiff to assess what is missing from the stolen research and company documents nor has the Court provided any repercussions for the offending party.

7   The Defendant's law firm also lied on September 11, 2019 regarding possession of C corporation documents.  Faith Miller Scheinkman stated that the C corporation documents were only "garbage" and not corporate documents.  The Plaintiff pointed out that her colleague at her law firm, Ms. Jackman, had stated in open Court in the previous session that the Defendant's law firm had Plaintiff's corporate documents and research. Again, these statements made by Faith Miller Scheinkman were false.  The Plaintiff reminded Judge Lubell of these conflicting and false statements and the Judge took no action.

141. ***The Count I Defendant(s) agreed to and did conduct and participate in the conduct of the enterprise's affairs through a pattern of racketeering activity and for the unlawful purpose of intentionally defrauding Plaintiff.***
**The pattern and duration of racketeering  has occurred since 2016 or before to the best of the Plaintiff's knowledge is substantiated from witnesses and evidence**.
The requirement "through a pattern of racketeering activity" has been met in several situations. These activities all hold similar relationships to the Plaintiff and enterprise. The Defendant Miller Scheinkman uses her position in the Enterprise via her marital relationship with Judge Scheinkman to commit the racketeering acts and as a result, the "through" requirement is fulfilled.  In this capacity, the defendant acted with the requisite *mens rea*:

   a   Purpose (same as intent): By design and willful acts, the Defendants have

threatened and coerced the Plaintiff at all costs.  The intention or knowledge of wrongdoing that constitutes part of a crime, as opposed to the action or conduct of the accused.  The predicate acts or offenses, and the relationship of these predicates is well demonstrated by their consistency, frequency and design to either threaten or injure the Plaintiff.

b  Knowledge: demonstrated by acts of perjury, direction to her client to eavesdrop, perjurious statements of the defendants, false sworn statements, falsified documents, theft of Corporate materials.  The Defendants stole and destroyed Corporate information, eavesdropped on Plaintiff, threatened Plaintiff, reduced the Plaintiff's access to healthcare, threatened and destroyed his relationship with his children, ruined him financially, left him without his titled home, destroyed his company and intellectual property pursuits.

142. ***Pursuant to and in furtherance of their fraudulent scheme, Defendant(s) committed multiple related acts as detailed under aforementioned predicate acts.***

143. ***The acts [list individually] set forth above constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).***

144. ***The Count I Defendant(s) have directly and indirectly conducted and participated in the conduct of the enterprise's affairs through the pattern of racketeering and activity described above, in violation of 18 U.S.C. § 1962(c).  As a direct and proximate result of the Count I Defendants' racketeering activities and violations of 18 U.S.C. § 1962(c), Plaintiffs have been injured in their business and property in that:***

1  Loss of income due to coercion and conspiracy
2  Irreparable damage to business and patents caused by theft
3  Loss of value assets including business, patents and home caused by theft and coercion
4  Psychological harm to the children and Plaintiff
5  Loss of constitutional rights
6  Loss of home- refusal of Court to allow Plaintiff to sell home in 2018 or to present information that the home is not marital property, but the property solely of the Plaintiff.  There is a reasonable expectation of forfeiture of the asset.
7  Loss of business
8  Loss of data and intellectual property related to the business
9  Damage to credit
10 Damage of reputation due to Temporary Protection Order

11 Damage to the Plaintiff's reputation due to lack of ability to continue the firm as an ongoing entity.
12 Loss of quality of life. Increased exposure to coronavirus
13 Damage to the Plaintiff's ability to raise capital and promote confidence in the investors.
14 Damage to relationship of Plaintiff's children with their grandparents (Plaintiff's parents)

As these are ongoing crimes, it is unclear at this moment if the damages included and stated here are fully inclusive.

The underlying predicate acts are a substantial factor in the succession and of responsible causation, and these injuries are reasonably foreseeable and anticipated as a natural consequence of the actions of the Defendants.

## **COUNT II**
### **RICO § 1962(d)**

145. **Plaintiff incorporates by reference all the preceding paragraphs of this Complaint as if fully set forth herein.  The allegations of paragraphs are incorporated herein by reference.**

146. **This Count is against Defendant(s) Faith Miller Scheinkman, Jennifer Jackman, Jennifer Lighter, Gary Lighter, Joanne Cambareri and the law firms (the "Count I Defendant(s)").**

147. **The Defendants violated RICO and Plaintiff was injured as a result.**

148. **As set forth above, the Count II Defendants agreed and conspired to violate 18 U.S.C. § 1962 (d).**

*The defendant's motions constitute overt acts of unilateral treatment by the enterprise whereby the plaintiff has not been allowed to defend and suffers from continued threats and assumed guilt:*

1 Plaintiff's original filed action which was delayed inexplicably for weeks by members of the Enterprise
2 Temporary protection order against plaintiff and violation associated with it.
3 Motion 4 against Plaintiff seeking restitution to Defendants and penalize the Plaintiff for financial discovery despite the fact that the Defendants never satisfied financial discovery to the Plaintiff.  The Enterprise and Defendants are aware of these facts yet allowed these matters to assert significant threats

61 out of 75

and hardship on the Plaintiff

    4  Motion 5 against Plaintiff which purposely and willfully omits signed stipulations by Defendants and Plaintiff to cause a misrepresention of the Plaintiff's actions as evidence that he defied a temporary protection order. The Enterprise and Defendants are aware of these facts yet allowed these matters to assert significant threats and hardship on the Plaintiff

    5  Motion 6 against Plaintiff which purposely and willfully misrepresents a third party website and its content as a device used by the Plaintiff.   The Defendants intended the misrepresentation of the Plaintiff's actions as evidence that he defied a temporary protection order.  The Enterprise and Defendants are aware of these facts yet allowed these matters to assert significant threats and hardship on the Plaintiff

  6. Plaintiff's response to the motions to include but not limited to Affidavit in Opposition and Affidavit to Vacate Default

  7. Plaintiff's Order to Show Cause to address the Temporary Protection Order.

A  The lack of action or response by the enterprise together with the overt allowance by the enterprise of the defendants' actions constitute overt acts to allow furtherance of the conspiracy.  *Plaintiff's requests for motions, motions, letters to court, and forensic report recommendations have been denied or ignored without reason by enterprise.*

    1  Letters by Plaintiff's counsel to court to request motions are ignored

    2  *pro se* letters to the court to request motions are ignored

    3  Forensic report recommendations are ignored

    4  Motion to vacate an order taken by default is dismissed without review

    5  Communications to Ms. Cambareri (Court appointed attorney for the Children) regarding children are ignored

    6  Denial of existence of plaintiff's motion, brought by order to show cause, to contest the "temporary" order of protection.

    7  Plaintiff's only motions (7 & 8) are rejected without review

B  Actions taken by plaintiff within the State of New York to seek remedies have been exhausted and demonstrate overt acts that furthered the conspiracy

    1  Motion to change venue to the Bronx

    2  grievance letters

    3  Administrative Judge Lawrence Marks states there are no attempts by the plaintiff to file motions which contradicts actual facts as well as Judge Lubell's experience

    4  Judicial review board letters resulted only in consolidation

    5  Letters to Court of Appeals Judge Janet DeFiore produces no suitable options

    6  Letters to NY State Attorney General has produced no effort to address

1    crimes.
2    7   The Plaintiff's Order to Show Cause to present evidence that the Defendant's
3        sworn statements are false was never heard in either Family or Supreme
4        Courts despite numerous requests.
5   C   The Defendants engaged in premeditated overt acts to further the conspiracy
6    i.1 Theft of documents- documents missing and pilfered prior to financial
7        discovery requests
8    i.2 Eavesdropping- at direction of Faith Miller Scheinkman
9    i.3 Temporary Protection Order- common tactic used by Faith Miller Scheinkman
10   i.4 *ex parte* Conversations- prior to actions of the Defendants
11       7.b On February 26th, 2020 Defendant Jackman stated on the record to
12           Judge Koba that she had sent a communication regarding the Plaintiff's
13           proceedings prematurely and made reference to the communication on
14           a prior day.  But Judge Koba's assignment of the case only occurred that
15           day.
16       7.c *ex parte* meetings between Judge Lubell and defendants and Judge
17           Lubell conducted private meetings with the Plaintiff's own lawyers that
18           the Plaintiff was not allowed to attend.
19       7.d Referee Ratner and Faith Miller Scheinkman have been observed many
20           times having *ex parte* conversations.  The Plaintiff has observed Ratner
21           having conversations regarding other cases with one lawyer without a
22           second lawyer being present.
23   5   On April 2nd 2020, the Plaintiff gained information that the Defendant
24       Jennifer Lighter had made active premeditated elections since 2018 to reduce
25       and ultimately remove the Plaintiff's healthcare by each year.
26   6   The direction by the Defendants to Enterprise overlook financial discovery
27       requirements of the Defendant while penalizing the Plaintiff for discovery
28   7   Active dismissal of motions without review by Judge Lubell
29   8   Judge Lubell's statements on record which indicate that the Plaintiff's
30       statements would not be on the record and subsequent inability of the
31       Plaintiff to receive transcripts of the Court sessions from Court reporters.
32   9    In March 2018, the Plaintiff filed a police report that he was concerned about
33       the Defendant's lying and mischaracterization of the Plaintiff.  The report was
34       later presented to the Enterprise but the Enterprise took no action.
35   10  In 2018 and 2019, the Plaintiff alerted the Harrison police of eavesdropping
36       and theft of corporate documents.  The Police official who was in contact with
37       the D.A. indicated the D.A. would not be pursuing the matters.
38   D   Off record Court Orders:
39   E   Sessions with Plaintiff's counsel without the presence of the Plaintiff and

subsequent refusal of lawyers to continue to represent the Plaintiff.

F   Health care loss and illness:

G   Priority scheduling of Defendants versus Plaintiff

    1.  Frequent delays for the benefit of Defendant Miller Scheinkman and defendants

    2.  Health Care accommodations by the Enterprise were biased and favored the Defendants: changes in scheduling based on Defendants' claims of feeling overworked while not accommodating documented health conditions of the Plaintiff or the Plaintiff's family.

    3.  Tactics show manipulation of Court process in favor of Ms. Miller Scheinkman to deny the Plaintiff due process.

    4.  The Enterprise has provided the last minute Court dates repeatedly to the Plaintiff who is out of state without proper service or notice.  The lack of notice places the Plaintiff at a disadvantage for preparation and puts the risk on the Plaintiff in the event he is unable to make the appearance. The penalties of a "no show" for the Plaintiff could result in a default decision and/or contempt charge against the Plaintiff.  The last minute notification placed the Plaintiff vulnerable to Contempt of Court for missing the mandatory court appearance, which he was given no notice of. The Court and Enterprise in this capacity were trying to trick the Plaintiff into committing an offense against the Court.  On December 18th, 2019, Judge Lubell scheduled a mandatory hearing on December 19th.  On Friday, December 6, 2019, at almost 8pm, the Plaintiff while *pro se* was notified for the first time of a mandatory court appearance for Monday December 9, 2019 at 9:30am.  The mandatory court appearance first showed up on the e-Track notification system at 7:51pm on Friday without time to prepare for a Monday meeting.   The Enterprise has provided improper notice and service that has threatened the Plaintiff on prior occasions.

H   On December 16th, the Judge ignored the statement and stated he would not have time before Easter to handle the case.  Judge Lubell reassigned the case to Judge Blackwood.

I    The Plaintiff and another witness separately contacted Judge Blackwood's chambers on December 16th Clerk Caroline Gomez told me and the witness separately that Judge Blackwood would not handle the case and there would be no appearance on the following day despite the listing.  As of approximately 5 PM, the Plaintiff contacted the Clerk to ask for a status on the case.  The Clerk informed the Plaintiff that the Court session would in fact take place.  This information was only made available to the Plaintiff after he proactively called and researched for the status.  The last minute notification placed the Plaintiff

vulnerable to Contempt of Court and default judgments for not being notified of the mandatory Court appearance.

J    The Plaintiff identified the Defendant's false information presented to the Enterprise regarding debt and equity positions of the Plaintiff's C Corporation. Once the Plaintiff reported this instance of Counterfitting by the Defendant, the Defendant and Enterprise removed the right of the Plaintiff to seek financial discovery via preclusion.

149. **The Count II Defendants have intentionally conspired and agreed to conduct and participate in the conduct of the affairs of the enterprise through a pattern of racketeering activity.  The Count IV Defendants knew that their predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes described above.  That conduct constitutes a conspiracy to violate 18 U.S.C.A. § (c), in violation of 18 U.S.C. § 1962(d).**

150. **As direct and proximate result of the Count IV Defendant(s)'conspiracy, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), Plaintiffs have been injured in their business and property by reason of:**

1    Loss of income due to coercion and conspiracy
2    Irreparable damage to business and patents caused by theft
3    Loss of value assets including potential business prospects, patents caused by theft and coercion
4    Psychological harm to the children and Plaintiff
5    Loss of constitutional rights
6    Loss of home or its proceeds- refusal of Court to allow Plaintiff to sell home in 2018 or to present information that the home is not marital property, but the property solely of the Plaintiff.
7    Loss of business
8    Loss of data and intellectual property related to the business
9    Damage to credit
10   Damage to reputation due to Temporary Protection Order
11   Damage to reputation due to interference with relationship with investors.
12   Damage to the Plaintiff's reputation due to lack of ability to continue the firm as an ongoing entity.
13   Loss of quality of life. Increased exposure to coronavirus without health insurance
14   Damage to the Plaintiff's ability to raise capital and promote confidence in the investors.

15 Damage to relationship of Plaintiff's children with their grandparents (Plaintiff's parents)

16 Health Care loss:  The Plaintiff suffered and continues to suffer from bloody noses, complete loss of ability to breathe through his nose, fever, night sweats, and severe sinus infections.  The Plaintiff has suffered from breathing problems, pain and loss of sleep for extended periods of time due to loss of health care.  As depicted earlier, the Defendant and Enterprise have actively allowed the Plaintiff to suffer as a result of his lack of health care.  These elections to misrepresent, interfere with, reduce and deny health care from the Plaintiff are done willfully with vindictive intent.

17 Financial loss due to out of pocket expenditures for surgery for the Plaintiff's

18 Loss of important documentation

19 Loss of personal possessions

20 Loss of children

151. **WHEREFORE, Plaintiff requests that this Court enter judgment against the Count IV Defendant(s) as per the damages section later described.**

## COUNT III
### Defendants'Attempts to force the Plaintiff to surrender throughout the proceedings through acts and threats of Extortion

152. **Plaintiff incorporates by reference all the preceding paragraphs of this Complaint as if fully set forth herein.  The allegations of paragraphs are incorporated herein by reference.**

153. **This Count is against Defendant(s) Faith Miller Scheinkman, Jennifer Jackman, Jennifer Lighter, Gary Lighter, Joanne Cambareri and the law firms (the "Count I Defendant(s)").**

154. **The Defendants violated RICO and Plaintiff was injured as a result.**

155. **As set forth above, the Count III Defendants agreed and conspired to violate 18 U.S.C. § 1962 (c).  Specifically:**

156. **Predicate Act:  Defendants'Attempts and acts of Extortion in violation of 18**

**U.S.C. § 1961, the Defendants knowingly made acts and threats of extortion.**
Faith Miller Scheinkman violated the Hobbs Act whereby the Plaintiff was subjected to extortion to obtain property through wrongful means.  ***The said wrongful means:***

    a  In this instance and stated with evidence, Faith Miller Scheinkman advised her client to illegally eavesdrop on the Plaintiff in order to advance a conspiracy and file a Temporary Protection Order.

    b  Faith Miller Scheinkman advised her client to file a temporary protection order based on false statements

          i  Several individuals familiar with the Enterprise, including Silvia Goldschmidt, Andrea Friedman and Peter Bodnar, independently stated that her abuse of the Temporary Protection Orders was due to her influence in Westchester

          ii  Several members of the Plaintiff's counsel independently stated that her abuse of the Temporary Protection Orders was used to weaponize the children against me as well as the Plaintiff's own property.

          iii  Faith Miller Scheinkman leveraged her position to successfully obtain the said order.

          iv  The Temporary Protection Order created a means of transfer under false pretenses of the Plaintiff's home, its contents, his company documents, and even his children to the Defendant.

          v  Subjecting the Plaintiff to a forensic psychologist as a means of resolving the Temporary Protection Order.

          vi  Subjecting the Plaintiff to another Defendant, Joanne Cambareri who has further acted wrongfully to advance the interests of the Enterprise instead of representing the interests of the children, who are her clients.

          vii  Faith Miller Scheinkman further used perjury as a means of extending the Temporary Protection Order.

          viii  Faith Miller Scheinkman further used obstruction as a means of extending the Temporary Protection Order.

          ix  Faith Miller Scheinkman orchestrated and coordinated successful means to indefinitely obstruct the Plaintiff's ability to gain a hearing to present evidence contrary to the claims of the said Order.

          x  In a Court Session, Defendant Joanne Cambareri received written direction from Defendant Faith Miller Scheinkman regarding how to answer Judge Lubell's questions

          xi  As previously described, Defendants engaged in *ex parte*

communications with the Enterprise.

c   The Defendant used threats and ultimatums as a method employed to further deprive the victim of his property.   The said threats occurred in forms such as Physical, Economic, Informational and Psychological harm

    i   The said Temporary Protection Order further threatened and prevented the Plaintiff's potential to earn income and cause him severe financial penalties.

    ii   The said Temporary Protection Order further threatened and left the Plaintiff without access to his office.

    iii   The Said Temporary Protection Order further threatened and left the Plaintiff homeless.

    iv   The said Temporary Protection Order further threatened his relationships with potential investors.

    v   The said Temporary Protection Order threatened and resulted in emotional hardship for the Plaintiff and his children

    vi   The said Temporary Protection Order threatened informational harm as the Corporate Documents were stolen and disseminated to third parties.

    vii   The said Temporary Protection Order further provided opportunities to threaten the Plaintiff financially via obligatory legal expenses with frequent nonproductive Court sessions.

## <u>COUNT IV</u>
### <u>Defendants' Attempts and Acts to Coerce the Plaintiff</u>

157.  **<u>Plaintiff incorporates by reference all the preceding paragraphs of this Complaint as if fully set forth herein.  The allegations of paragraphs are incorporated herein by reference.</u>**

158.  **<u>This Count is against Defendant(s) Faith Miller Scheinkman, Jennifer Jackman, Jennifer Lighter, Gary Lighter, Joanne Cambareri and the law firms (the "Count I Defendant(s)").</u>**

159.  **<u>The Defendants violated RICO and Plaintiff was injured as a result.</u>**

160.  **<u>As set forth above, the Count II Defendants agreed and conspired to violate 18 U.S.C. § 1962 (c).</u>**

161.  **<u>Predicate Act:  Defendants' Attempts and acts of Coercion *In violation of 18 U.S.C. § 1961*, the Defendants' use of force or threat of force restricted the</u>**

**Plaintiff's freedom of action; use of threats to dictate and restrict the actions and decisions of the business; defendant threatened with actual property damage to compel the Plaintiff to acquiesce in his legal proceedings and forgo the right to bring lawsuits against the Defendant Miller Scheinkman**

a   The Plaintiff has been forced to suffer from his medical condition without an opportunity to address via surgery or post-surgical care due to the Defendant's ability to influence the Court to overlook of the Defendant's client's violations of court ordered stipulations.

b   The Plaintiff has been forced to give up his visitation to his own children to allow his children to leave with non-custodians without any custodial parent.

c   The Plaintiff has been continually forced to attend Court sessions without due notice on last minute notice with threats of incarceration

d   The Plaintiff has been forced to argue motions with no time for review.

e   The Plaintiff has been forced to respond to motions that have easily identifiable acts of perjury and obstruction.

f   The Plaintiff has been forced to have supervised visits via a paid agency in part due to a recommendation of the Defendant that contradicts the Court's own Court-mandated investigation and report via a forensic psychologist.

g   The Plaintiff has been forced to suffer from scheduling of Court sessions that benefitted the Defendant but occurred at the cost of the Plaintiff.

h   The unheard Temporary Protection Order garnered further opportunity for the Defendant to threaten the Plaintiff.  The Plaintiff lives in fear of being arrested due to additional false claims that create violations.

i   These false claims materialized and created their own threats against the Plaintiff.

j   Additional threats were made verbally to attempt to coerce Plaintiff into giving up the Corporate patents to the Defendant's Client

k   Compensation of loss of time for access to the children to be reflective of the time until resolution of the matter times .60. The plaintiff has been forced to give up access to his children based on the Defendants' actions and the Enterprise's direction and then subsequently penalized for not seeing his children during the same time.   In this example 60% of 3 years which would equal 1.8 years to be delivered.  To minimize changes to the children.  The time will be gradually introduced over a 3 month time window and will never result in more than 80% of time for the Plaintiff as the Plaintiff believes the Defendant Jennifer Lighter should have access to the children.

l   Alimony and previous alimony provided to reflect income prior to divorce which in this example estimates at $290,000 per annum for the defendant and $0 for the Plaintiff.  The Plaintiff should be awarded in this example

1   estimates $145,000 per year for the past few years as well as going forward.
2  m The Defendant will be responsible for forgoing
3
4
5 162. ***WHEREFORE, Plaintiff requests that this Court enter judgment against the Count***
6 ***I Defendant(s) as follows:***
7  1 **Financial Damages: $105,903,916.71**
8   **(estimated based on information available to Plaintiff during the**
9   **drafting of this complaint and may not reflect full duration nor updated**
10   **costs. For sake of estimate four years was used as a proxy but will need**
11   **to be updated)**
12    a. Penalties for violation of section 1832 of the Economic Espionage Act
13    include fines for up to $5 million for organizations.
14    b. Damages due to Plaintiff for loss of value of shares in Mico Bio Inc.
15    $18 million
16    c. Loss of 130 Wendover Rd. home $3.7 million
17    d. Loss of potential income due to the Plaintiff to protect from the
18    enterprise without legal representation $399k x 4= 1.6million to
19    present and continuing
20    e. Personal Financial Destruction 12k month (after taxes) x 7 years
21    (based on expenses)=  1.008 million
22    f. Psychological Repair from forced estrangement- 25 years, includes
23    Plaintiff and children (2) weekly visits $500x52x25x3=1.95 million
24    g. Financial damages uniquely due to Enterprise Involvement:
25     1. money judgment in the amount for $101,627.57
26     2. Cost of surgery due to Defendant's illegal cancellation of the
27     Plaintiff's medical insurance.  Approximately $12k
28     3. Tax Related $250k estimate
29     4. Damage to reputation due to Temporary Protection Order:  $5
30     million (EST)
31     5. Unknown expenses claimed by Defendant: **TBD**
32     6. Reimbursement for attorneys' fees that the racketeering has
33     caused Plaintiff to incur and reimbursement for what Plaintiff
34     was required to pay.  All attorney's fees to date:  approximately
35     $400k that has caused him hardship using the State of New York
36     Judicial System and rendered his own counsel ineffective.
37     7. Loans from parents approximately $250k
38     8. Loss of assets (not including home): clothing, jewelry, antiques,
39     furniture, music equipment and household possessions

a.  Instruments:  prototype Zion guitars...... made by the founder of Moriah 11k x 3= 30k, Gretch guitar limited edition hollowbody 1k, 5 string base $900, banjo $150, keyboard fully weighted midi controller $1200, handmade classical guitar from spain $1000,

b. Antique Clocks estimate 2k

c.  Jewelry watches, platinum, rings, soveriegns, coins, estimate 12000k

d.  Musical equipment including:
1.  microphones $6k
2.  yamaha mixing board and accessories $2800
3.  processing units $1500 x 5
4.  speakers approximately 25 throughout home
5.  3 bose cube surround sound speaker systems
6.  stereo amplifiers and ohm splitters $800x 3 +$500. $2900
7.  audio recording monitors $750
8.  guitar amplifiers and power amps 3k
9.  miscellaneous wiring, stands, and interfaces $500
10. sound booth 2k
11. rack mount unit and monitors $800

e.  Personal Clothes:  2 tuxedos, approximately 10 suits, custom monogrammed shirts miscellaneous (x24), cashmere coat, sheepskin coat, (9,900)

f.  hardware tools and equipment=  $2500 wood chipper full wrench ratchet screwdrivers, sawzall, circular saws, pumps, drills, toolboxes

g. workout equipment=$800

9.  Loss of social security benefits differential due to a pending award to Defendant of a 10 year divorce.  TBD

10.  Reimbursement for lack of maintenance and damage on 130 Wendover Road Property which occurred during the Plaintiff's absence.  (TBD)

11.  Unpaid of 130 Wendover Road rent  10k per month.. $120k per year x 4 years. $480k

12.  Money to compensate homeowner for use of their homes while the Plaintiff was homeless 4k per Month

13.  Loss of patents opportunities:  3.3 million based on prior acquisition costs.

14.  Purposeful risk of Plaintiffs life and well being.  Damages related to risk for lack of healthcare and risk due to loss of residence due to unlawful conduct by the Defendants   and Enterprise in the presence of a pandemic, Covid 19. The conspiracy and actions presented preventable and unnecessary hardship and risks for the Plaintiff.  (Life time risk $200k x 40 = 8 million)

15.  Loss of Plaintiff's parental rights as it relates to the children

    Music lessons provided from Plaintiff to each child

    $100   x 4 per week x 2 children = $800 per week

    $800 x  52 x 4 years (presently)=  $166400

    Loss of chess lessons from Plaintiff to each children

$50 x 2 children per week=$100

    $100 x 52 x  4 years = $20800

    Loss of general tutoring from Plaintiff to children

    $300 x 2 children per week =$600

    $600 x 52 x 4 years = $124800

16.  Lost alimony at approximately $145000 or more per year pending discovery.

17.  Reimbursement for what Plaintiff was forced to spend on     the forensic psychologist, forensic accountant, and other legal fees not yet claimed but services already rendered.     TO BE DETERMINED

18.  reimbursement for loss of healthcare insurance 3years x 1000x12=  36000

2  Injunctive Relief Sought:

    a.  Return of all corporate property

    b.  Inventory of all intellectual property and corporate property and its assigned location conducted by third party to be paid for by Defendants

    c.  Written accounts of the method of transfer of all documents that have been disseminated.

    d.  Identification and subpoena of all parties that have received corporate information

    e.  Cease and desist orders to all parties that have received intellectual property

    f.  Orders to prevent the Enterprise or Defendants or any related parties the ability to use relevant intellectual property in any way

    g.  Cancellation of the temporary protection order

    h.  Inclusion of all offenses contained herein including the eavesdropping offense under the RICO statute of limitations

i. Payment of healthcare insurance in interim at the Plaintiff's choice of Plan as well as compensation for health insurance during the lack of coverage period at a calculated rate of a premium plan

j. An Injunction halting Divorce proceedings

k. Subpoena of all communications with Defendants and members of Enterprise with Bronx and Westchester Courts

l. Subpoena of all communications between Defendants and members of Enterprise and Bronx and Westchester County Clerks

m. Subpoena of all communications with patent attorneys or other individuals associated with the Defendants who have received, or discussed corporate documents or personal documents of Plaintiff.

n. Provide a list of all investors of the company that have been contacted by the Defendants, Enterprise forensic accountant or enterprise.

o. Reassignment of the matrimonial case and any related matters to an independent Federal justice.

p. Reversal of all court orders against the Plaintiff

q. Issuance of Permanent Protection Orders or an equivalent means to protect the Plaintiff from all Defendants and the Enterprise members.

r. Return of sole possession of the 130 Wendover Road, Rye NY real estate with exclusive access to the property and its contents.  The house will be returned and all outstanding debt related to the asset will be satisfied by the Defendants without benefit of equity or any future claims.

s. All grievances for attorney practices contained herein should be reviewed by an independent board.

t. To prevent other individuals from suffering similarly, F.Miller Scheinkman, J. Jackman, J. Cambareri should be disallowed from practicing in Westchester and the Bronx or any other jurisdiction whereby F. Miller Scheinkman's husband had jurisdiction.

u. Transfer of all future legal matters involving the Plaintiff presented to Westchester Court to another Federal jurisdiction independent of Judge Scheinkman's previous jurisdiction.

v. An investigation into practices of the Defendants and Enterprise violation of ethics should be done by an independent authority.

w. Subpoena all electronic devices and accounts of the Defendant Faith Miller and her husband Judge Sheinkman.  Investigation via geolocation and cross referencing phone records of members of the Enterprise with the Defendants should be done to further confirm the activities of the enterprise and verify additional predicate acts of racketeering.  Devices used for communication by the Defendants may include computers and

1         telephones collectively owned by the marriage of Miller Sheinkman.

2    x.   Immediate dissolution of marriage with all assets and property returned
3        to Plaintiff.  Property that has been used by the plaintiff will be subject to
4        review for full compensation to the Plaintiff for damages and theft.  All
5        accounts will be returned with a zero debt balance and remain satisfied
6        for during the course of the three years.

7    y.   Equitable Compensation to Plaintiff for alimony as determined by income
8        ratios from the two years preceding the filing of the action in 2018 as is
9        customarily done.

10    z.   Revised New York Rules for Courts  regarding temporary protection
11        orders to provide for required metrics for their issuance, maintenance of
12        these orders, renewal, requirements for conversion to permanent, and
13        maximum duration without a hearing as well as
14        liabilities to the Court for not adhering to the policy.

15    aa. Revised New York Rules for Courts for nepotism whereby a spouse, ex
16        spouse, or any family member of any Court official can not practice law in
17        the same District.

18    bb. Custody of the children with provisions for both parents to access
19        children.  Court orders to the Defendants Jennifer Lighter and Gary and
20        Jessica Lighter will provide for specific time and place for Defendants to
21        deliver the children and pick up the children. All access to the children will
22        be assigned to the parents with a right of first refusal during their
23        assigned time.

24    cc. A third party oversight committee will investigate and observe the
25        conduct of the Westchester Supreme and Family Court and the Bronx
26        Supreme Court to prevent further occurrences of the aforementioned
27        unlawful behavior.  The oversight committee will provide a published
28        report to a Federal agency that will be available to all citizens in the State
29        within a year of resolution of this matter.

30    dd. All matters as it relates to this case will be subject to review by a Federal
31        Court instead of a New York State Court.  This includes matters related to
32        Plaintiff in conjunction with intellectual property, witnesses, other
33        individuals contained herein, counsel, as well as any matters that include
34        the Plaintiff and/or members of the Enterprise and/or the Defendants.

35    ee. All distribution of assets will be subject to the decisions of a Federal
36        Court.

37    ff.   Communication signed by the Defendants Law Firm and Defendants and
38        Enterprise written and approved by the Plaintiff to rectify damages to his
39        credibility and standing in the community.  These letters will be sent to

Homeland Security, the Harrison School District, the Harrison Police Force, the Westchester Court as well as the Bronx Court to identify their inappropriate actions with these agencies and subsequently withdraw and refute any negative statements or repercussions it may have towards the Plaintiff and his children.

gg. All claims regarding intellectual property, copyrights, and patents will be resolved by this Complaint.  It is recommended to the Court that Defendants be subject to full forfeiture of all intellectual property (copyrights, trademarks, patents) whether personal or related to Mico Bio Inc.  due to the claims associated with the Plaintiff due to the theft and interference by the Defendants in the ongoing nature of Mico Bio Inc., its intellectual property, and any intellectual property of the Plaintiff.

hh. Any future matters related to this matrimonial action, assets, or intellectual property will be handled by a Federal Court.

ii. A third party evaluation of the use of Temporary Protection Orders within New York employed by clients of Faith Miller Scheinkman's firm to be reported to the FBI and published for the good of the people of New York.

jj. Revoking of Judge Scheinkman's negative gatekeeping policy "Rule E".

kk. Damages to the Plaintiff's Credit will be remedied.  Letters will be drafted and signed by Defendants and Enterprise members addressed to all affected parties which include but not limited to financial companies, debt agencies, credit agencies, credit card companies and banks to indicate that the Plaintiff's circumstances were a violation of law and that the Plaintiff should not free from any negative repercussions their actions have caused the Plaintiff.

ll. Reassignment of the matrimonial case and any related matters to an independent justice outside of Judge Scheinkman's previous jurisdiction.

3  Attorney's fees:

a.i  **RICO Specific TBD researched provide for attorneys fees**

## **PLAINTIFFS DEMAND TRIAL BY JURY.**

## **END OF COMPLAINT**